### A. A. BROWN ET AL. V. CITY OF GALVESTON.

#### No. 1229.   Decided June 26, 1903.

**1.—Constitutional Law—City Charter—Government Conferred on Board of Commissioners.**

The charter of the city of Galveston (Act of April 18, 1901) in conferring upon a president and board of commissioners, a majority appointed by the Governor, the power of governing the city usually committed to a mayor and city council, was not void as violating art. 6, sec. 3, of the Constitution, giving all qualified electors the right to vote for a mayor and all other elective officers; nor was it beyond the power of the Legislature to enact as being in derogation of an inherent right of local self-government by municipalities, arising, by implication, from history and tradition in this State.   (Pp. 8-10.)

**2.—Same—Legislature—Implied Limitation.**

The principles on which restriction of the powers of the Legislature may. be implied discussed, and various sections of the Constitution compared and held not to show a limitation of the power to commit municipal government to appointive officers.   (Pp. 10-12.)

**3.—Powers of Government—Distribution—Limitation.**

All political power is inherent in the people of the State (Const., art. 1, sec. 2) and it is to them that the right of local self-government is secured (Const., art. 1, sec. 1).   These powers are distributed among the departments of the State government (Const., art. 2); and all the powers of the people which may properly be. exercised in the formation of laws against which there is no inhibition expressed or implied in the Constitution, are conferred upon the Legislature.   (Const., art. 3, sec. 1.)   (Pp. 12-15.)

**4.—Legislative Power—Natural Justice—Spirit of Constitution.**

No inherent right of municipal self-government can be implied from the history or traditions of the State; nor have the courts power to set aside a law enacted by the Legislature because of conflict with principles ,of natural justice or the supposed spirit of the Constitution.   (Pp. 15, 16.)

**5.—City Taxation—Occupation—License.**

A city ordinance imposing payment of a license fee upon the right to own carriages and other vehicles, could not, upon its face, nor from the fact that the revenues therefrom were devoted to street improvement, be pronounced a revenue measure only, and invalid because an occupation tax not imposed by the State (Const., art. 8, sec. 16); but would be presumed to be passed in the exercise of the police power of the city.   (Pp. 16-18.)

Questions certified from the Court of Civil Appeals for the First District, in an appeal from Galveston County.

*James B. & Chas. J. Stubbs,* for appellants.—The imposition of a license tax on vehicles, whether for public or private use, by an ordi-

97 Supreme—1.

nance which provides that a portion of the tax or charge shall be used for numbering the vehicles and paying the expenses of issuing the license and keeping a record thereof, and that the remainder and larger portion shall be devoted exclusively to maintaining and repairing the streets, is not, as to such latter levy, an exercise of the police but of the taxing power, and to the extent that the funds collected are required to be used for purposes not incident to the regulation and supervision of such vehicles and of their use is void. Charter of Galveston, sec. 34, subdiv. 29, secs. 51, 62; Hoefling v. San Antonio, 85 Texas, 228; Laredo v. Loury, 4 (Wilson) Civil Cases, 559; Ex Parte Terrell, 48 S. W. Rep., 504; Ex parte Gregory, 1 Texas Crim. App., 753; Ex parte Slaren, 3 Texas Crim. App., 662; 2 Dill. on Mun. Corp., sec. 768; 1 Dill. on Mun. Corp., secs. 357-359 and notes; Cooley's Const. Lim., 242; Gundling v. Chicago, 177 U. S., 189; Royall v. Virginia, 116 U. S., 572; 1 Desty, Taxation, 305; Cooley on Taxation, 597, 598; Terre Haute v. Kersey, 8 Mun. Corp. Cas., 398; St. Paul v. Traeger, 25 Minn., 248; Chicago v. Collins, 175 Ill., 445; Adams Ex. Co. v. Owensboro (Ky.), 3 S. W. Rep., 370; Home Insurance Co. of N. Y. v. City of Augusta, 50 Ga., 530; North H. C. Railway Co. v. Hoboken, 41 N. J. L., 71; Clark v. City of New Brunswick, 43 N. J. L., 175; Bennett v. Borough of Birmingham, 31 Pa., 15; Livingston v. City of Paducah, 80 Ky., 656; City of Covington v. Woods, 98 Ky., 344; Walker v. City of New Orleans, 31 La. Ann., 828; In re Laundry License Case (D. C.), 22 Fed. Rep., 701; City of Philadelphia v. W. U. Telegraph Co., 40 Fed. Rep., 615; State v. Glavin, 67 Conn., 29; City of St. Louis v. Boatman's I. and T. Co., 47 Mo., 150; City of St. Louis v. Marine Insurance Co., 47 Mo., 163; State v. Beans, 91 N. C., 564.

In so far as useful occupations are concerned, the power to levy taxes for police regulation is limited to the reasonable expense of identification and supervision, and the burdens complained of were in excess of such charges. Authorities supra, especially Hoefling v. San Antonio, 85 Texas, 228.

The city of Galveston was without authority to either enact or enforce such ordinances, as the commission created by the charter, which was an act of the Legislature approved April 18, 1901, was without warrant of law, and was a board not authorized by, but contrary to the Constitution and its requirements. Const., art. 6, sec. 3; Galveston Charter of 1901, sec. 5, et seq.; Ex parte Lewis, recently decided by the Court of Criminal Appeals, not yet reported.

*J. Z. H. Scott*, for appellee.—The ordinance in question is competent and proper as a regulation of vehicles, etc., in the exercise of the police jurisdiction of the city, and the license dues exacted are equally competent and proper as an incident to and in aid of police superintendence and regulation of the subject. The petition of plaintiffs showing no reasons to the contrary, and plaintiff declining to amend same, was properly dismissed. Charter of Galveston, 1876, as amended, secs. 41,

45, 56; Charter of Galveston, 1901, secs. 34, 51; Constitution, 1876, art. 8, sec. 17, art. 11; Ex parte Gregory, 20 Texas Crim. App., 210; Hoefling v. City of San Antonio, 85 Texas, 228; City of Laredo v. Lowry, 4 (Willson's) Civil Cases, 559; Ex parte Terrell, 48 S. W. Rep., 504; Dillon, Mun. Corp., sec. 748; Tiedeman Lim. Pol. Power, sec. 101; Dillon, Mun. Corp., 4 ed., secs. 115, 357, 358-360; Chilvers v. People, 11 Mich., 43; Ash v. People, 11 Mich., 347; State v. Herod, 29 Iowa, 123; Morgan S. S. Co. v. Louisiana Board of Health, 118 U. S., 455; Nashville, etc., Railway Co. v. Alabama, 128 U. S., 96; People v. Squire, 145 U. S., 175; Charlotte, etc., Railway Co. v. Gibbes, 142 U. S., 386; Crowley v. Christensen, 137 U. S., 86; In re Kemmler, 136 U. S., 436; Ex parte Converse, 137 U. S., 624; Powell v. Pennsylvania, 127 U. S., 678; Walker v. Pennsylvania, 127 U. S., 699; Russell on Police Power of State, pp. 25 to 30, chaps. 3, 4, 5, 6, 7, 9; Mayor of New York v. Miln, 11 Pet., 102; McGuire v. Commonwealth, 3 Wall., 387; Puryear v. Commonwealth, 5 Wall., 475; Beer Co. v. Massachusetts, 97 U. S., 25; Sands v. Manistee Imp. Co., 123 U. S., 288; Ferry Co. v. E. St. Louis, 107 U. S., 365.

Power to tax (using the words in sense of means of raising revenue merely) is distinct from police powers and not included in the latter. Dillon, secs. 764, 768. But power to regulate and license includes power of incidental taxation in aid of regulation. Chilvers v. People; Ash v. People, supra; Desty on Taxation, sec. 64, pp. 303, 316, and notes; Brewster v. City of Pine Bluff, 65 S. W. Rep., 934, and authorities cited.

[On the constitutional questions involving the validity of the charter of the city of Galveston, briefs of J. Z. H. Scott and J. P. Drouilhet in Galveston & W. Railway Co. v. City of Galveston, and of C. K. Bell, Attorney-General, and J. Z. H. Scott, in Ex parte Lewis, were filed in this case also.]

BROWN, ASSOCIATE JUSTICE.—The Court of Civil Appeals for the First District certified to this court the questions hereinafter copied, with a statement from which we make the following extracts and condensed statement of facts alleged in the petition, which will be sufficient to understand the points discussed in this opinion:

"A. A. Brown and about fifty other citizens of Galveston brought this suit for themselves and all others similarly situated against the city of Galveston, a municipal corporation, for an injunction to restrain the enforcement of certain ordinances of the city requiring the payment of license dues or taxes upon vehicles kept for public or private use or hire, and for a judgment declaring the invalidity of the ordinances and the provisions of the charter on which they are based. A temporary injunction was granted. The defendant filed a motion to dissolve.

"The principal grounds of the motion were want of equity in the bill, an adequate legal remedy and the denial of some of the averments

of the petition. The answer also contained a general demurrer, and admitted that the petition correctly set out the portions of the charter and ordinances under which defendant assumed to act, and that plaintiffs were pursuing the occupations and using the vehicles stated in the bill, upon which license dues were claimed by the defendant; also that defendant had levied and intended to levy and collect ad valorem taxes upon property subject to taxation, including the vehicles upon or on account of which license dues were claimed, and that it also had levied and collected or intended to levy and collect city occupation taxes from all of the plaintiffs liable therefor; that is to say, one-half of the occupation taxes levied by the State upon the same pursuits, and that such ad valorem and occupation taxes are 'over and above and separate from' the license dues which are the subject of this controversy.

"After a hearing, the defendant's motion to dissolve was sustained, and the plaintiffs declining to amend, the court dismissed their petition and rendered judgment for the defendant."

The plaintiffs allege that the city of Galveston is a municipal corporation, chartered by and organized under an act of the Legislature of the State of Texas, entitled: "An act to incorporate the city of Galveston and to grant it a new charter and to repeal all pre-existing charters," approved April 18, 1901, which took effect on the 8th day of July of that year.

The first section of the charter declares, "that all the inhabitants of the city of Galveston shall continue to be a body politic and corporate with perpetual succession by the name and style of the "City of Galveston," and as such they and their successors by that name shall have, exercise and enjoy all the rights, immunities, powers, privileges and franchises now possessed and enjoyed by the said city and herein granted and conferred, and shall be subject to all the duties and obligations now pertaining to and incumbent upon said city as a corporation not inconsistent with this act, and may ordain and establish such acts, laws, regulations and ordinances not inconsistent with the Constitution and laws of this State as shall be needful for the government, interest, welfare and good order of the said body politic." The section authorizes the city to sue and be sued by that name; to purchase, lease, grant and convey real property, etc. Section 2 defines the limits of the city of Galveston and its territorial jurisdiction, and section 3 divides the city into wards, defining their boundaries. Section 4 transfers to the new city all the waterworks, sewerage plants, fire engines, fire alarms, and all other kinds of property of every character which was possessed and owned by the old city. Section 5 is as follows: "There shall be appointed by the Governor of the State, as soon as possible after the passage of this act, three commissioners, one of whom he shall select and designate as president of the board of commissioners provided for herein, and within ten days after the passage of this act it shall be the duty of the Commissioners Court of Galveston County to order an election to be held in the city of Galveston, at which election the qualified voters

of the city of Galveston shall select two other commissioners, who, together with the three commissioners appointed by the Governor, shall constitute the board of commissioners of the city of Galveston. In ordering such election, the Commissioners Court shall determine the time and the places in the city of Galveston for holding such election, and the manner of holding the same shall be governed by the laws of the State regulating general elections. Each of said five commissioners shall be over the age of 25 years, citizens of the United States, and for five years immediately preceding their apointment or election residents of the city of Galveston. Each of said five commissioners shall hold office for two years from and after the date of his qualification and until his successor shall have been duly appointed or elected, as the case may be, and duly qualified. Said board of commissioners shall constitute the municipal government of the city of Galveston." Section 6 declares that the president and other members of the board of commissioners shall be held and deemed in law the successors of the mayor and aldermen of the city of Galveston, and upon qualification by the commissioners as required by the charter, all powers, rights and duties of the mayor and board of aldermen of the city shall cease, and that the said board of commissioners shall represent the city of Galveston in all matters in which the board of aldermen and the mayor would have represented it under the old charter. Sections 7, 8, 9, 10 and 11 provide for the qualification of the commissioners by taking the oath and executing the bond prescribed, for their removal and for filling all vacancies, with other provisions, which do not affect the question before us. Section 12 provides that "said board of commissioners so constituted shall have control and supervision over all the departments of the said city, and to that end shall have power to make all such rules and regulations as they may see fit and proper concerning the organization, management and operation of such departments, and shall have power under such rules and regulations as they shall make to appoint, and for cause which to the said board shall seem sufficient, after an opportunity to be heard, to discharge all employes including the chiefs of the departments respectively."

The charter invests the board of commissioners with full power for the government of the city, which is unnecessary for us to set out in detail; suffice to say, that they embrace every phase of city government and confer upon the board ample power to enable it to perform the duties enjoined. The power to levy and collect ad valorem, occupation and license taxes is given to the city. Among other powers conferred is the following: "To authorize the proper officer of the said city to grant and issue licenses and direct the manner of issuing and registering thereof, and the fees and charges to be paid therefor; provided, that no license shall be issued for a longer period than one year and shall not be assignable, except by permission of the board of commissioners." Section 51 of the charter reads as follows: "To license and tax the owners of all vehicles in the city of Galveston used or kept for private

or public use, and to license, tax and regulate hackmen, draymen, omnibus drivers and drivers of baggage wagons, porters and all others pursuing like occupations, with or without vehicles, and prescribe their compensation, and provide for their protection, and make it a misdemeanor for any person to attempt to defraud them of any legal charge for services rendered, and to regulate, license and restrain runners for steamboats, railroads, stages and public houses; and enforce the collection of all such taxes by proper ordinances; and all revenues collected under the provisions of this section, or any ordinance passed in pursuance thereof, shall be used only for the improvement of the streets and alleys of said city."

The power is also given to levy taxes upon different occupations, including merchants and all classes of dealers in merchandise as well as all the occupations which are taxed by the State government. Section 94 provides that the act shall be taken and held as a public law by all courts and tribunals, which shall take judicial notice and knowledge of the contents and provisions thereof.

It is alleged that the board of commissioners of the city of Galveston, claiming to act in pursuance of and by the authority of the charter of the city, ordained and adopted ordinances of which article 527 is in these words: "That it shall be unlawful for any person, firm or corporation in said city to run or keep, for public or private use or hire, any of the vehicles hereinafter mentioned, without having first obtained a license therefor, and given a bond, and paid the license dues prescribed by this ordinance." Article 528 prescribes the method by which the license may be obtained and what shall be done by the citizens in order to obtain it, among which it is provided that applicants "shall pay the following license dues: for each and every dray, furniture cart, or grocery or delivery wagon, drawn by not more than one animal, as license dues, the sum of five dollars, and the cost of numbering not to exceed twenty-five cents; for each and every milk or butcher wagon, or other vehicle used for such purpose, drawn by not more than one animal, as license dues, the sum of two dollars and fifty cents, and the cost of numbering not to exceed twenty-five cents; for every truck or float, drawn by two animals, as license dues, the sum of twelve dollars, and the cost of numbering not to exceed twenty-five cents; for all other four-wheeled vehicles used for transportation of merchandise, baggage, etc., and drawn by two animals, as license dues, the sum of eight dollars, and the cost of numbering not to exceed twenty-five cents; provided, that when any vehicle is drawn by a greater number of animals than that specially set forth for such vehicle, an additional amount of one dollar shall be paid for each additional animal; for each and every hack and omnibus and for each and every street railway car, for the transportation of passengers for hire, or for the use and convenience of the guests of hotels, as license dues, the sum of eight dollars, and the cost of numbering not to exceed twenty-five cents; and for each and every buggy kept for hire, as license dues, the sum of two dollars and fifty cents, and the cost of num-

bering not to exceed twenty-five cents; for each and every private carriage drawn by more than one animal, as license dues, the sum of five dollars, and the cost of numbering not to exceed twenty-five cents; for each and every buggy, buckboard or other vehicle not heretofore mentioned, kept for private use, as license dues, the sum of two dollars and fifty cents, and the cost of numbering not to exceed twenty-five cents." Provision is made for regulating the numbering and licensing of the said vehicles. All license dues are required to be paid to the city collector who, after paying the expenses of issuing licenses and numbering the vehicles, must pay the remainder to the city treasury to be applied exclusively to improving the streets, alleys and avenues of the city.

The petition alleges that the plaintiffs were the owners of vehicles kept for public and private use, or for hire, and that the city of Galveston had levied ad valorem taxes upon each and all of the said vehicles. The petition also alleges that the said petitioners had paid all of their occupation taxes levied upon any of the businesses in which they were engaged, which said occupation taxes are enumerated in the following provision of the ordinance adopted therefor: "From every livery or feed stable, fifteen cents; for each stall, fifteen cents; for each hack, buggy or other vehicle, and from every hack, buggy, dray, wagon, or other vehicle, let for hire, not connected with the livery and feed and sale stable, one dollar; from every wagon yard used for profit, two dollars and fifty cents." The petition attacks the license taxes charged against their vehicles as being without authority and in violation of the Constitution of the State of Texas: they charge that the said license taxes are really laid for the purpose of revenue and not for police purposes. It is also alleged that the said ordinances are void because the parts of the charter which authorize the Governor of the State to appoint three commissioners for the city of Galveston and those provisions which invest the board of commissioners with the powers of the city government are contrary to the Constitution of the State. It is alleged that the city of Galveston is enforcing the said ordinances by arresting some of the plaintiffs and threatening to arrest the others for refusal to pay the said taxes. The allegations in the petition are explicit, setting out amply the grounds upon which the injunction is sought, but it is deemed unnecessary to make a more particular statement. The following questions are submitted to this court by the Court of Civil Appeals:

"1. Did the city of Galveston have authority under the act of the Legislature, approved April 18, 1901, granting it a new charter and repealing all pre-existing charters to enact and enforce the ordinances by virtue of which the right to collect the license tax was claimed?

"2. Were the charter and ordinances authorizing the collection of the tax in conflict with the provisions of the Constitution of this State on taxation?

"3. Did the court below err in sustaining the motion to dissolve the injunction and in dismissing the petition?"

The first question submitted to us involves the constitutionality of those sections and provisions of the charter of the city of Galveston, which empower the Governor of the State to appoint three members of the governing board of commissioners for that city and of those which invest that commission so constituted with the powers of mayor and board of aldermen. This question arose in the case of Ex parte Lewis, which was decided by the Court of Criminal Appeals in this State, reported in the Southwestern Reporter, volume 73, page 811. The majority opinion was delivered by the Honorable John Henderson, Justice, and concurred in by the Honorable W. L. Davidson, Presiding Justice of that court. Judge M. M. Brooks dissented from the opinion of the majority. In that case the majority held that the law which authorized the Governor to make the appointment of the three commissioners was contrary to the Constitution of the State of Texas. The majority and dissenting opinion each show extensive research into the authorities and contain able and elaborate arguments and discussions of the principles involved. Recognizing the equal authority and dignity of that court, we approach the investigation of the question with much hesitancy because of the delicacy of the duty to be performed. We shall accord to the opinion of the majority in that case equal weight as an authority with that of any other court of last resort, and because it is a court of co-ordinate powers with this, acting under authority derived from the same Constitution, we feel constrained to conform our opinion to that, if we can properly do so in the discharge of our duty. The industry of the judges who wrote those opinions has relieved us of much labor that would have been necessary to obtain the same list of authorities, and we are much aided in the solution of this important question by the arguments presented by each.

It is claimed by the appellant, and was so held by the Court of Criminal Appeals, that the provisions of the charter in question are in violation of the following section of the Constitution of Texas: "All qualified electors of the State, as herein described, who shall have resided for six months immediately preceding an election within the limits of any city or incorporated town, shall have the right to vote for mayor and all other elective officers; but in all elections to determine the expenditure of money or assumption of debt, only those shall be qualified to vote who pay taxes on property in said city or incorporated town." Art. 6, sec. 3, State Constitution.

Before proceeding to the examination of the question we will state a few general principles of interpretation and construction which are applicable to this case. The Constitution of this State distributes the powers of government thus: "those which are legislative to one, those which are executive to another, and those which are judicial to another; and no person or collection of persons being of one of the departments, shall exercise any power properly attached to either of the others, except in instances herein expressly permitted." Constitution, art. 2. Article 3, section 1, of the Constitution, is in this language: "The leg-

islative power of this State shall be vested in a Senate and House of Representatives, which together shall be held to be the Legislature of the State of Texas." This language vests in the Legislature all legislative power which the people possessed unless limited by some other provision of the Constitution.

Each legislator is required to take the official oath prescribed by the Constitution, which pledges him to discharge his duty in conformity with that instrument. The enactment by the Legislature of the charter of Galveston involved the consideration by each member of both houses and the Governor of the question now before us, that is, each must have determined that the bill did not violate the Constitution of the State of Texas in any particular. A court has no power to review the action of the legislative department of the government, but when called upon to administer a law enacted by it, must, in the discharge of its duty, determine whether that law is in conflict with the Constitution, which is superior to any enactment that the Legislature may make; but in the examination of such a question we must bear in mind, that, except in the particulars wherein it is restrained by the Constitution of the United States, the legislative department may exercise all legislative power which is not forbidden expressly or by implication by the provisions of the Constitution of the State of Texas. Lytle v. Halff, 75 Texas, 132; Harris County v. Stewart, 91 Texas, 143; Cooley, Const. Lim., 200, 201. If there be doubt as to the validity of the law it is due to the co-ordinate branch of the government that its action should be upheld and its decision accepted by the judicial department. In his work on Constitutional Limitations, page 218, Mr. Cooley says: "The question whether a law be void for its repugnancy to the Constitution is at all times a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station could it be unmindful of the solemn obligation which that station imposes; but it is not on slight implication and vague conjecture that the Legislature is to be pronounced to have transcended its powers, and its acts to be considered void. The opposition between the Constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other."

The honorable Court of Criminal Appeals expressed its conclusion that the sections of the charter of the city of Galveston in question are in conflict with the Constitution in the following language: "However, it is not necessary to rest this decision upon implication, as, in our opinion, the Constitution expressly prohibited the Legislature to either appoint directly, or through the Governor, the local municipal officers of cities and towns, inasmuch as the Constitution expressly confers the power on the citizen voters of the municipality 'to elect the mayor and other elective officers.' * * * We hold that the mayor and the board of aldermen of said city were elective officers under and by virtue of our Constitution, and that the majority of these, in the face of our

traditions and of the organic law itself, having been appointed by the Governor, any law or ordinance passed by them was without authority, inasmuch as they were not officers of the municipality, and could not, under our Constitution, be such." That court could arrive at its conclusion only by implication, for the language used in the section of the Constitution quoted does not declare that there shall be a mayor for each town and city. As we have seen, the power of the Legislature can be limited only by a prohibition contained in the Constitution either in express terms or by fair implication arising from the instrument. If the purpose the convention had in adopting the section in question can be effected without the prohibition, none will be implied. Lytle v Halff & Bro., 75 Texas, 132. In the case cited Judge Stayton said: "A prohibition of the exercise of a power can not be said to be necessarily implied, unless looking to the language and purpose of the Constitution it is evident that without such implication the will of the people, as illustrated by a careful consideration of all its provisions, can not be given effect. * * * An intention to restrict the power of a State Legislature, and especially in reference to such a matter, further than this is done by express limitations, is not to be presumed, and when it is claimed that this is done by implication those so claiming ought to be able to point out the provision or provisions of the Constitution which require such implication to give effect to the will of the people evidenced by the entire instrument." Regulation of the elective franchise is the subject of article 6, the first section of which declares what persons shall not be permitted to vote. Section 2 prescribes the qualifications for electors in the State, and the third section classifies the electors of the State who reside in cities or incorporated towns, securing to all qualified voters the right to vote in elections "for mayor and all other elective officers;" but in elections to determine the expenditure of money or the assumption of a debt, only those who pay taxes on property in cities or incorporated towns are permitted to vote. The purpose of this section is to secure to all electors of the State residing in cities and towns the right to vote at all elections for elective officers of such corporations, and to secure to property taxpayers the right to determine questions of the expenditure of money and the assumption of debts when submitted to a vote. In order to determine the meaning of this provision, we must look to all parts of the Constitution that will throw light upon the matter. Article 11 deals with the organization of municipal corporations and contains limitations upon their authority to levy taxes and to incur debts, but we find none upon the authority of the Legislature to create municipal corporations in such manner and under such forms as it deems proper; on the contrary, sections 4 and 5 of that article are couched in such language, that, standing alone, the Legislature would be left free in the organization of cities and towns in prescribing the form of government. It is not reasonable to conclude that the convention would have left so important a matter to be arrived at by implication from language used in reference to a different subject. The fact

that the convention failed to express such limitation in article 11, where it would be most appropriate, or in any part of the Constitution, furnishes strong evidence that no intention existed in the minds of the members of the convention to require the Legislature to provide for a mayor in the organization of every city or town. Our Constitution is distinguished for the particularity of its provisions and the details into which it enters in reference to matters of government. Counties are classed as municipal corporations in article 11, yet the convention, in other parts of the Constitution, specify the officers for the counties—including justices of the peace—and provide for their election. It is significant that the Legislature was thus left free to choose the form of government for cities and towns in contrast with the particular provisions for counties. As the specific directions with regard to counties by implication deny to the Legislature authority to provide other methods, so the want of such directions as to towns and cities shows the intention of the convention to leave it to legislative discretion. Section 3 of article 6 is self-executing to the extent that when an election is ordered for either named purpose in a town or city, the right to vote in such election is secured by the Constitution and no implication arises, because not necessary to complete the purpose of that section of the Constitution. Lytle v. Halff & Bro., above cited; Cleburne v. Railway Co., 66 Texas, 461. In the latter case the court said: "A power will be implied only when without its exercise an expressed duty or authority would be nugatory." A requirement that every question involving the disbursement of funds be submitted to a vote of the property taxpayers of each town and city may as well be implied as that a mayor must be provided for to be elected by the voters, because the privilege to vote on such propositions is secured in the same sentence by language as definite as that which expresses the elector's right to vote for mayor. The phrase "shall have the right to vote for mayor and other elective officers," means, that such electors shall have the right to vote at all elections for elective officers. If from this language it be implied that each town must have a mayor in order that the electors may exercise their constitutional right, the same implication would require that all propositions involving the expenditure of money should be submitted at an election to the property tax-paying voters in order that they may exercise their constitutional right to vote on the question. The fact that the Constitution directs that all propositions to levy taxes to support public free schools in cities and towns shall be submitted to a vote of the property taxpayers (Art. 11, secs. 7 and 10; art. 7, sec. 3), shows that the convention did not understand that section 3, article 6, embodied such requirements, else the special provisions would be useless. The association of the two phrases, relating to the same general subject, indicates that they were used in the same sense, as related to the different matters to be determined by the voters. Suth. Stat. Const., sec. 262; Bear v. Marx, 63 Texas, 301.

The majority opinion argues with much force the proposition that the charter of Galveston is in conflict with section 3 of article 6 of the

Constitution, but we do not believe it is so conclusive as to justify this court in overruling the decision of the legislative department. If there was doubt in our minds our conclusion must be as expressed in the following quotation: "But if I could rest my opinion in favor of the constitutionality of the law on which the question arises, on no other ground than this doubt so felt and acknowledged, that alone would, in my estimation, be a satisfactory vindication of it. It is but a decent respect due to the wisdom, the integrity, and the patriotism of the legislative body by which any law is passed, to presume in favor of its validity, until its violation of the Constitution is proved beyond all reasonable doubt."

It is asserted by the appellant that the people of Galveston had the *"inherent right"* to select their own municipal officers, and that the Legislature had no power to authorize the Governor of the State to appoint municipal officers for that city. This proposition seems to be supported by the majority opinion in the case of Ex parte Lewis (73 S. W. Rep., 811), from which we quote. After citing a number of cases the Court of Criminal Appeals said: "But the reasoning in all of the cases—those referred to as well as all others—to which our attention has been called, except State of Nevada v. Swift, 11 Nev., 134, strongly supports the proposition, that, even without some express constitutional provision, neither the Legislature nor the Governor has the power to appoint the permanent officers of a municipality. In the cases cited it occurs to us that the real effect of the decisions was to establish the doctrine, that, in the absence of a grant of authority in the Constitution authorizing the appointment of such local officers by the Legislature or the Governor, this power was denied by implication arising from the history and traditions which time out of mind had conferred local self-government on municipalities." That honorable court drew its conclusion from the following cases: People v. Hurlbut, 24 Mich., 44; Allor v. Wayne Co. Auditors, 43 Mich., 76; Davock v. Moore, 63 N. W. Rep., 424; Geake v. Fox, 63 N. E. Rep., 19; State v. Denny, 118 Ind., 449. People v. Hurlbut is the corner stone upon which this theory rests and upon which all of the other decisions cited have been constructed. In that case three great jurists, Christiancy, Campbell and Cooley, delivered separate opinions, and in the course of the discussion of the question which was before them, each referred to the history and traditions of that State in reference to municipal corporations as throwing light upon and aiding in the construction of this provision of the Constitution of that State. "Judicial officers of cities and villages shall be elected, and all other officers shall be elected or appointed at such time and in such manner as the Legislature shall direct." The question before the court was whether the Legislature had the power to appoint officers for a city or village, or should it have provided for the election by the voters of such city or village, or for appointment of such officers by the municipal authorities. In discussing the question the three eminent judges went elaborately into the history of municipal corporations

in the State of Michigan, avowedly for the purpose of showing that the convention intended to preserve the rights, which had previously existed under their charters, for the people of cities and villages to elect or appoint their own local officers, and they used the facts to show that the language of the Constitution was intended to express that the Legislature should provide for the appointment or election by the municipality, from which they implied a prohibition against the Legislature making appointments of water and light commissioners for the city of Detroit. Each of the distinguished jurists was careful to state the ground upon which his opinion rested, that is, upon the true intent and meaning of the Constitution, in proof of which we quote from the opinion of Judge Cooley as follows: "In view of these historical facts and of these general principles the question recurs whether our State Constitution can be so construed as to confer upon the Legislature the power to appoint for municipalities the officers who are to manage the property, interest, and rights in which their own people alone are concerned." The court in that case held that the Constitution forbade the Legislature to enact such a law except that in the organization of a city or village it might make provisional appointments of officers to hold until the people could elect those which were provided by the charter. A misconception of those opinions and the purposes for which those able jurists referred to the history of corporations in that State has led some courts into the use of very extravagant and sensational language upon the subject of "the inherent right" of a people to control their own local affairs when organized into municipal corporations. An examination of cases cited fails to show a single authoritative decision which upholds the doctrine announced by the Court of Criminal Appeals in Ex parte Lewis. In every case that we have been able to find, no matter what the judge may have said, the judgment of the court was finally rested upon some provision of the Constitution of that State, except the case of State v. Moores, 55 Neb., 840, which has been overruled by the Supreme Court of that State.

We have examined many authorities upon this question and find but one case which directly negatives the proposition that is asserted in the opinion of the Court of Criminal Appeals; but all of the cases cited by us sustain appointments of municipal officers made by the Governor. The case of Redell v. Moores, 55 Law. Rep. Ann., 740, decided by the Supreme Court of Nebraska, directly overruled State v. Moores, before cited. Of the opinion delivered in the former case the Supreme Court of Nebraska says: "The majority opinion, to our minds, introduces a new principle into our system of jurisprudence, and one pregnant with mischievous consequences. We have been taught to regard the State and Federal Constitutions as the sole test by which the validity of acts of the Legislature are to be determined. If the majority opinion in that case is to stand as the law of the State, then in addition to such test there is another,—an illusive something, elastic and uncertain as an unwritten constitution, which may be evoked to defeat the legislative

will. We can not believe that such a principle should receive the final sanction of this court." From the many authorities which support the position of the Nebraska court, we cite: Newport v. Horton, 22 R. I., 196; Americus v. Perry, 114 Ga., 871; Harris v. Wright, 121 N. C., 172; Philadelphia v. Fox, 64 Pa. St., 169; State v. Hunter, 38 Kan., 578; Luehrman v. Taxing District, 2 Lea, 425; People v. Wood, 15 N. Y., 532; Nevada v. Swift, 11 Nev., 128.

In our own State the doctrine is well settled that a municipal corporation can exist only by and through an act of the Legislature of the State, and that it has no power not granted by the charter and can have no officer not provided for by law. Blessing v. Galveston, 42 Texas, 641; Pye v. Peterson, 45 Texas, 312; Vosburg v. McCrary, 77 Texas, 568. But the doctrine of vested rights and powers derived from "history and traditions" asserts a higher law than the Constitution, for if, in the absence of a prohibition, the Legislature can not enact a law in contravention of "history and traditions," the convention could not by express provision have authorized it to be done. The Legislature of Texas may exercise any power than could be exercised by a constitutional convention, except wherein the Constitution contains a prohibition expressed or implied. According to the theory advocated, an unorganized community has rights which can not be enjoyed and powers which can not be used until those rights are conferred and the powers are granted by the State in the form of a charter. Yet the dormant rights and powers are protected by "history and traditions" which are thus made superior to the creative power.

In the case of State v. McAlister, 88 Texas, 284, section 3, article 6, of the Constitution of this State was under examination, but with a view to determine another question, and in the discussion of that question the court referred to the fact that before the present Constitution was adopted corporations existed with certain forms of government, which was considered by the court in reaching the conclusion that the convention did not intend to overturn the existing municipal corporations in the State, and in view of the facts, the language of that section of the Constitution was construed so as to harmonize with conditions that existed at the time of its adoption. It was not said nor intimated that municipal corporations existed in this State before the organization of the State government or the government of the Republic. In fact, there were no such municipalities within the territory constituting this State, and we have no such traditions nor history connected with the municipal corporations to influence the court in determining the meaning of any provision of the Constitution upon that subject.

The doctrine contended for is antagonistic to the fundamental principles of our State government, as we understand them. In article 1 of the Constitution of this State it is declared that, "maintenance of our free institutions and the perpetuity of the Union depends upon the preservation of the right of local self-government unimpaired to all of the States." It will be observed that the declaration of the right of local

self-government has reference to the people of the State and not to the people of any portion of it. The doctrine contended for would produce as many kinds of local government in a State as there might be different kinds of people in the municipalities. Again, in section 2, it is said that "all political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit." This is a true declaration of the principles of republican State governments; however, it does not mean that political power is inherent in a part of the people of a State, but in the body, who have the right to control by proper legislation the entire State and all of its parts.

Article 2 of the Constitution distributes the powers of government—the powers which reside in the people—into three departments: "those which are legislative to one, those which are executive to another, and those which are judicial to another." By organizing into a State, with its different departments, empowered to exercise the authority of the people in the administration of their affairs, the people did not part with their power; it remains with them to be exercised by the departments according to their limitations and provisions, which are expressed or implied in the Constitution, for their government and direction. By section 1, of article 3, the Constitution declares, "the legislative power of this State shall be vested in a Senate and House of Representatives, which together shall be styled 'the Legislature of the State of Texas.'" "The legislative power of this State" means all of the power of the people which may properly be exercised in the formation of laws against which there is no inhibition expressed or implied in the fundamental law. Since a municipal corporation can not exist except by legislative authority, can have no officer which is not provided by its charter, and can exercise no power which is not granted by the Legislature, it follows that the creation of such corporations and every provision with regard to their organization is the exercise of legislative power which inheres in the whole people, but by the Constitution is delegated to the Legislature; therefore, it is within the power of the Legislature to determine what form of government will be most beneficial to the public and to the people of a particular community.

The doctrine is in conflict with the well settled principle of constitutional construction that the power of the Legislature can be restrained only by a prohibition expressed or implied from some provision or provisions of the Constitution itself. Lytle v. Halff & Bro., before cited; Harris County v. Stewart, 91 Texas, 143.

The doctrine rests upon a basis which is opposed to the well settled rule of construction, that a law which is passed by the Legislature of a State can not be set aside by the courts because it is in conflict with the principles of natural justice, nor because of its conflict with the spirit of the Constitution. Cooley, Const. Lim., 205. That author says: "Nor are the courts at liberty to declare an act void because, in their opinion, it is opposed to a spirit supposed to pervade the Constitution, but not expressed in words."

It contradicts the truth of the history of municipal corporations in Texas, for it is a matter of common knowledge that charters are formulated by the people of the towns, presented by their representatives to the Legislature, and in case of opposition, committees attend upon the Legislature to secure the wish of the majority. The city of Galveston had two representatives in the House and one in the Senate that enacted this law, and the bill was introduced in the House by one of her representatives and supported by all. To overthrow the charter of that city upon the assumption of "a history and tradition" which have no real existence, would in fact be to deny to the people of Galveston the right to govern their affairs in their own way, and thereby to substitute a form of municipal government dictated by the courts.

In fact this theory is out of harmony with the practices of republican State governments in America, and opens up a broad field in which to search for grounds to declare laws of a Legislature void without the shadow of authority in the well established powers of the courts under our Constitution. As said by the court in Redell v. Moores, before cited, it is "an illusive something, elastic and uncertain as an unwritten constitution, which may be invoked to defeat the legislative will." "The doctrine" furnishes no standard or rule by which to determine the validity of any law framed by the Legislature, but leaves each judge to try it according to his own judgment of what constitutes the "history and traditions" of the State and what rights have been vested in the people by reason of such "history and traditions." To this theory we can not give our consent, but must adhere to the well established rules of construction which confine the court to the Constitution as the standard by which it is to determine the validity of legislative enactments.

The ordinance adopted by the city of Galveston, which levied a tax upon all vehicles owned and kept in the said city for public or private use or hire, is attacked as being invalid, because in conflict with the following proviso of section 1 of article 8 of the Constitution: "And provided further, that the occupation tax levied by any county, city or town, for any year, on persons or corporations pursuing any profession or business shall not exceed one-half of the tax levied by the State for the same period on such profession or business." There being no occupation tax levied by the State upon the keepers of such carriages, it follows, that if the levy made by the city of Galveston is an occupation tax, the ordinance is void. Hoefling v. San Antonio, 85 Texas, 235. The statement certified to this court does not include the title or the preamble of the ordinance which levied the tax, and we have no means of determining the purposes for which the levy was made, except the terms of the ordinance itself, which contains nothing but the bare fact that it is denominated a license tax, and that it authorizes licenses to be issued to the owners of such vehicles.

It is well established by the authorities, and as we understand the contention of appellants is not denied by them, that the city of Galves-

ton could by virtue of the authority granted in its charter levy license taxes on vehicles for the purpose of regulating their use.   Cooley on Taxation, p. 600; 2 Desty on Taxation, p. 1398; St. Louis v. Green, 7 Mo. App., 468; Ex parte Gregory, 20 Texas Crim. App., 210.   But it is insisted by the appellants that the fees charged under the ordinance were not levied for the purpose of regulation in the exercise of police power of the city, but were levied under the taxing power and must be controlled by the limitations of the Constitution upon the exercise of that power.   In support of this contention it is urged that the ordinance itself requires that after paying the insignificant expense of issuing a license and placing upon the carriage the number, not to exceed twenty-five cents, the remainder of the fees charged shall be paid over to the city treasurer to become a part of the fund for improvement of streets of the city, which determines the character of the assessment to be that of a tax levied for revenue.

It is true the authorities hold that the police power can not be used for the purpose alone of raising revenue, and when exercised by a city for the purpose of raising revenue it will be held to be by virtue of taxing power and not of the police.   But the fact that the assessment under the police power results in producing revenue, which may be paid into the treasury for the use of a particular fund, or as part of the general fund, does not deprive the assessment of the character of a police regulation.   Ex parte Gregory, 20 Texas Crim. App., 219, 220. Discussing a like provision in an ordinance of the same city, the Court of Criminal Appeals said: "A reasonable interpretation of this would be that, while the expense of enforcing the regulations in regard to vehicles must be paid, it should be paid out of some other fund instead of this particular one, and the appropriation of this particular fund to another purpose would in no way relieve the city from the expense, or any portion thereof, of enforcing the regulations.   In other words, the expense of enforcing the regulations must be paid for by the city, and it matters not out of what fund the same is paid.   This was a matter within the discretion of the council, and can not in any way, we think, affect the validity of the ordinance as to the levy of the license tax.   It by no means follows that, because this particular fund was not set apart exclusively for the payment of the expenses incurred by the police regulations, therefore there are no such expenses, and that therefore the purpose of the tax is for revenue alone, and not for the purpose of police regulation."

The expense of issuing a license and placing a number upon the carriage is only the preparation for exercising the police power over the use of the vehicle, the cost of which could not be foreseen.   When a city is authorized to levy a license tax upon particular property or business and that tax has been imposed upon the property, it will be presumed that the levy was made for the purposes authorized by law.

We conclude that the charges imposed upon the property of appellants were levied in the exercise of the police power conferred upon the city

97 Supreme—2.

of Galveston by its charter, and that the revenue derived from it did not affect the validity of the ordinance.

To the first and second questions we answer, that the city of Galveston had authority under its charter to enact and enforce the ordinances which are brought in question in this action, and that the said ordinances are not in conflict with the provisions of the Constitution of this State on taxation. To the third question we answer, that the court did not err in sustaining the motion to dissolve the injunction and dismissing the petition.