BROWN, Mayor, v. UHR. (No. 5762.) *
(Court of Civil Appeals of Texas. San Antonio. June 14, 1916. Rehearing Denied June 21, 1916.)

1. MUNICIPAL CORPORATIONS ⟨⟩183(1)—CITY CHARTER—"EMPLOYÉ."
    Under the City Charter of San Antonio, as amended in 1915, enumerating the appointive and elective officers of the city and providing that officers and employés shall hold office for two years, the city marshal, not being enumerated as an officer, is an "employé" as the word is used in the charter, and not an appointive officer appointed by the mayor.
    [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 473; Dec. Dig. ⟨⟩183(1).
    For other definitions, see Words and Phrases, First and Second Series, Employé.]

2. MUNICIPAL CORPORATIONS ⟨⟩131 — CITY CHARTER—CONSTRUCTION.
    In San Antonio City Charter, § 16, pars. 1, 2, touching appointive officers, the words "unless otherwise provided" refer to other provisions made in the charter, and not to ordinances that may be passed.
    [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 305, 378; Dec. Dig. ⟨⟩131.]

3. MUNICIPAL CORPORATIONS ⟨⟩126 — CONSTRUCTION—CITY CHARTER—"OFFICES OR EMPLOYMENT."
    Under San Antonio City Charter, § 16, par. 3, providing for the creation by the commission of "offices and employments," reference is not

had to elective and appointive offices already enumerated and limited in the charter, but the words "offices or employment" are necessarily synonymous.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 298–300; Dec. Dig. ☞126.

For other definitions, see Words and Phrases, First and Second Series, Employment; Office.]

4. MUNICIPAL CORPORATIONS ☞168 — CON-STRUCTION—CITY CHARTER.

Under the City Charter of San Antonio, the provisions giving the mayor "all powers and duties not distributed or assigned to another department," being a general provision, will not affect a special provision, section 16, enumerating and defining the nominating powers of the mayor.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 376; Dec. Dig. ☞ 168.]

5. APPEAL AND ERROR ☞839(1)—REVIEW—MATTERS NOT IN RECORD.

The appellate court will not go outside of the pleadings to inquire into matters not properly before the court, and which cannot affect the questions involved.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3279; Dec. Dig. ☞839(1).]

Appeal from District Court, Bexar County; W. F. Ezell, Judge.

Action for injunction by Robert F. Uhr against Clinton G. Brown, Mayor. Judgment for plaintiff, and defendant appeals. Affirmed.

Geo. R. Gillette, Robt. G. Harris, and R. J. McMillan, all of San Antonio, for appellant. Joseph Ryan, Frank H. Wash, and Scott & Dodson, all of San Antonio, for appellee.

FLY, C. J. This is an application upon the part of appellee to obtain a writ of injunction to restrain appellant, as mayor of the city of San Antonio, from proposing, nominating, or appointing any employé in the police and fire department. A temporary writ of injunction was granted, and from the order granting such writ this appeal has been perfected.

For many years prior to 1901, American cities had the reputation, doubtless well earned, of being the worst governed of any found in the civilized countries of the world. The ward system prevailed; that is, the city was divided into wards, and the citizens of each ward elected their representative, or alderman, in the city council, which was composed of the mayor and the aldermen of the respective wards. The mayor, under that form of municipal government, was often the only officer elected by the whole electorate of the city, and the struggle for spoils among the aldermen was the order of the day, and trading and trafficking was indulged in so that each alderman might get his share and could have something to point to in his ward, as the evidence of his fitness for the position, at the next election. The term of office of each alderman was a continued series of strife, combination, and trading with his fel-low members; the interests and welfare of the people at large being almost entirely forgotten and neglected. The alderman had his eye to the main chance for himself and, instead of serving the interests of the public, favors for the certain ward were to be obtained which might or might not be of benefit to the inhabitants thereof, but would have the designed and desired effect in inuring to the political welfare and benefit of the alderman. The meetings of the council were fields of conflict for spoils and, as so aptly said by a newspaper writer, "divisive strife" attended the consideration of municipal affairs. Under the aldermanic form of government, the mayor was the center of the system, the great dispenser of patronage and favors, and in the charter of San Antonio, up to June 1, 1915, he was clothed with the authority, not only to name all appointive officers, agents, employés, and servants, but, if an elective officer died, refused to accept, resigned, or was removed, the vacancy was filled by the mayor, subject, as to all of them, to confirmation by the council. Not only did the mayor have the nomination, which, with the usual subservient council, meant final appointment of the officers named, but he was given the autocratic power of discharge of any appointive officer, employé, agent or servant of the city. He was the absolute ruler of the destinies of the city, and, fortified as he was by the control over the men employed by the city, he held a position well-nigh impregnable against the ill-directed and unorganized efforts of dissatisfied voters.

But matters at last reached a limit, and a demand so strong, so well organized, so potent in numbers and influence was made that an amendment to the charter was adopted, which vitally and radically changed the form of government. That change was made possible by the act of the Legislature of April 7, 1913, known as the "Enabling act," and in February, 1914, the amendment was adopted by the people and was approved by the Legislature in 1915. This amendment became a part of the charter of 1903 and as amended is now the charter of the city of San Antonio. In that amendment was proposed what is known as "commission government," and was adopted, the central and main ideas of the amendment being to constitute a government consisting of five commissioners, and it was provided that the executive and administrative duties, powers, and authorities should be distributed among five departments, as follows:

"(A) The department of public affairs in general; (B) the department of taxation; (C) the department of sanitation, parks, and public property; (D) the department of streets and public improvements; and (E) the department of fire and police."

The duties of each commissioner were carefully set forth in the amendment, the mayor being placed at the head of the "De-

partment of Public Affairs in General." He is given general supervision and oversight over all departments, offices, officers, and employés of the city. He is made chairman of the board of health, and is given authority to sign all contracts and obligations on the part of the city, to have charge of and cause to be prepared and published all statements and reports, to preside at all meetings of the commissioners, and appoint committees. In addition, he is given all powers and duties not assigned to some other department. The duties and powers of each commissioner are specially enumerated, those of the police and fire commissioner being the enforcement of all fire and police regulations, the supervision of the police and fire department, and the city pound, the lighting of the city, and to perform such other duties as may be provided by the commission. In paragraph 8 of section 7 of the charter, the mayor and each commissioner is given all powers necessary or incident to a proper discharge of the duties imposed upon each of them.

The commission form of government was the child of necessity, born. in storm-riven Galveston in 1901, when, undaunted by one of the greatest disasters of history, the energetic and unconquerable people of that city determined to build for the future and entrench themselves behind bulwarks that the tempest and waters could not overcome, and recognized the truth that the rehabilitation of the Island City could never be obtained through their aldermanic government. The citizens of that city knew the shortcomings and inefficiency of that form of government, and, so knowing, out of their genius and intelligence, spurred on by the exigencies of their misfortune, formulated and put into effect the first real commission government created and supported by the people of any community. The scheme was put into form, the city government was divided into departments, the head of each department with his duties defined, and on April 18, 1901, the charter was granted by the Legislature. The people had become so distrustful of men elected by voters of the city that it was provided in the charter that of the five commissioners three should be appointed by the governor. In that charter, the commissioner who presided over the commission was denominated the president. The power of appointment and removal of all employés was given to the commission. The charter was attacked as unconstitutional by reason of the provision as to appointment of three commissioners by the Governor, but was sustained by the Supreme Court. Brown v. City of Galveston, 97 Tex. 1, 75 S. W. 488. In that charter, each of the commissioners was given his department by the commission, the departments being those of "police and fire," of "streets and public improvements," of "waterworks and sewerage," and of "finance and revenue." The only appointing power given

the president of the board of commissioners was that of special policemen in time of outbreaks or riots. To strip the mayor of his patronage and power was one of the chief aims of this initial commission government.

The government of Galveston was an unbounded success, and, untrammeled by politics and patronage, the city rose as by the hand of magic from her desolated homes and industries, and accomplished in her seawall one of the wonders of the world. Prosperity attended her efforts, until, in a few short years, she had obtained the position of the chief seaport of the South and one of the principal gateways of the oceans of the earth. Soon other cities followed the example set by Galveston, and in all parts of the American Union commission governments were adopted over the protests of politicians and spoilsmen, and in each of them to a greater or less degree is the constant purpose evinced to restrict the powers of the mayor, to destroy one-man government and to place the affairs of each department of municipal government in the hands of a responsible agent, to whom the people can look directly for the proper administration of the affairs of his department.

In the Galveston charter, the commissioner of the fire and police department was given the authority to prepare and present to the board of commissioners the persons he desired in his department, and was given the power of suspension of any one in his department except the chiefs of police and fire.

[1] The commission amendment to the charter of San Antonio of 1903, in its general features, followed the charter of Galveston, and it followed the general purpose of every commission charter in circumscribing the power and authority of the mayor, and placing the powers of government in the different commissioners elected by the people of the city. This is clearly evidenced by paragraph 1 of section 16 of the present charter, wherein it is provided:

"The mayor shall nominate the appointive officers, and such nomination shall be subject to confirmation by a majority of the remaining commissioners, and the mayor shall not vote, except in the case of a tie, upon such confirmation."

In order that there should be no doubt as to who are appointive within the scope of the paragraph, it is provided therein, immediately succeeding the foregoing:

"The appointive officers of the city shall be as follows: City attorney and his assistants; city physician and his assistants; city auditor and his assistants; purchasing agent; and city clerk and his assistants."

The language is plain and simple, and by every reasonable inference denies the right to the mayor to name any officer except those enumerated. There could have been no reason for that enumeration, except to remove every reasonable doubt as to whom the mayor could nominate. There could be no ground for assuming that the language defining who

are appointive officers was inserted in the paragraph, defining the powers of the mayor, merely to create those offices. But, even if the provision did create those appointive offices, it did not alter the restriction placed upon the mayor of having no power to nominate, except as to those appointive officers named. In section 7, paragraph 1, the officers who are required to be elected consist of the mayor and four other commissioners, and it is clear that they are the only elective officers for which provision is made; and then in paragraph 1, section 16, herein quoted, the only appointive officers provided for in the charter are specifically named. Every other person connected with the administration under the charter provisions must be placed in the designation of employés. The charter could legally and validly call those employed by the municipal corporation officers, employés, agents, or servants, and still that would not strip them of any honors or emoluments or lessen their term of office under the constitution. The charter is explicit as to who are appointive officers, and they could no more be added to or decreased than could the elective officers named therein. The elective officers and appointive officers are absolutely named and fixed by the charter, and all others connected with the city government must be employés, agents, or servants.

[2] Having absolutely confined the nominations of the mayor to the appointive officers, and having specifically classified and named them, the succeeding paragraph in section 16 makes provision for the appointment of the other persons connected with or employed by the city government. The paragraph is as follows:

"Each member of the commission shall have the right to propose and nominate all employés in the department under his special charge, unless otherwise provided, but all such nominations shall be subject to the confirmation of the commissioners by a majority vote thereof."

To hold that this provision did not give the commissioner of the police and fire department the right, power, and authority to nominate the men, for whose proper administration of the affairs of the department he is responsible to the people who elected him, would render the provisions of the charter farcical and absurd. It would be a comedy to solemnly clothe a commissioner with the power to appoint a messenger boy, a charwoman, or a janitor, and put the appointment of all men on whom he must depend for the efficiency of his department in the hands of some one else. It cannot be conjectured that such a state of affairs was ever contemplated. It is clear to the mind of this court that the word, "employés," as used in paragraph 2 of section 16 of the charter of San Antonio, meant every one connected with the police and fire department from the chiefs down to the humblest employé. The language of paragraphs 1 and 2 of section 16, construed together, lead inevitably to that conclusion. The words, "unless otherwise provided," refer to other provisions made in the charter, and not to ordinances that may be passed. Had the reference been to provisions by ordinance the charter would undoubtedly have so stated. The exception was made to cover the city physician and his assistants and the auditor and his assistants, which it was provided should be nominated by the mayor. Naturally, without that provision, the city physician and his assistants would have been appointed by the commissioner of the sanitary department, and the auditor and his assistants by the commissioner of taxation; but the charter makers deemed it best to place the nominating power in the hands of the mayor as to those officers. In section 17, the charter itself places the employés, except day-laborers, on the same footing as officers, by providing that the appointments of officers or employés shall be for a period of two years, thereby recognizing the constitutional provision that all officers shall hold office for the term of two years. In the same section officers and employés are placed on the same footing as to removal or discharge, and in the provision as to salaries, taken with other parts of the charter, recognition is had of the fact that every one connected with the city administration, not designated therein as an elective or appointive officer, is an employé.

[3] The section of the charter as to the elective officers of the city is no plainer and no more explicit than the section naming the appointive officers, and, if the appointive officers whose nomination shall originate with the mayor can be added to and increased, the elective officers can be increased. In no part of the charter is authority given the commission to increase the number of the appointive officers to be named for appointment by the mayor, and paragraph one of section 16 definitely and finally names the only appointive officers that can be nominated by the mayor. It shows the clear intention to curtail the appointive power of the mayor and take from him the means of fortifying himself in his position, as in the past, by taking from him the power to control the firemen, policemen, and employés connected with other departments of the city government. One of the chief evils sought to be removed by the adoption of a commission government would be enthroned in its old place under aldermanic government, and the departmental heads be made mere puppets in the hands of the mayor, if the contention of appellant should be sustained. Responsibility of each department head is a prime object also in commission government, and that responsibility cannot in justice be exacted, where the department's efficacy depends on employés of a mayor who may at times be antagonistic to the head of the department. In paragraph 3 of section 16, where provision

is made for the creation by the commission of "offices or employments," reference cannot be had to elective or appointive offices, for they had already been named and limited in the charter; and the words, "offices or employ-.ment," are necessarily synonymous. The charter has seen proper to divide the servants of the city into elective and appointive officers, officers, employés, servants, or agents, and necessarily its provisions must be followed. It would totally distort the provisions of the charter and stultify and destroy the ends of its creation, if, by a vote of the majority of the commissioners, all those designated as employés could be transformed into appointive officers to be nominated for appointment by the mayor. The language of the charter will not bear such a construction, and we cannot conceive that such was the intention of the makers of the charter.

[4] The provision giving to and enjoining upon the mayor "all powers and duties not distributed or assigned to some other department are hereby assigned to the mayor," cannot be properly construed to destroy the evident purpose of section 16; for therein his nominating powers are specially enumerated and defined, and no general provision can nullify, increase, or enlarge the terms of the special provision. The special provisions as to who are the elective and appointive officers must prevail, and no other elective or appointive officers can be added to the list named. Naming other employés "officers" does not put them in either class named in the charter. This construction of the charter provisions has been sustained by the Supreme Court of Michigan in Burroughs v. Eastman, 93 Mich. 433, 53 N. W. 532, wherein it was held:

"We are of the opinion that plaintiff's counsel is correct in his contention. The statute creating the superior court must be construed in reference to the provisions of the charter of the city of Grand Rapids and the police force act; and from an examination of the three acts it appears that policemen of the city and the police officers are not named in the charter, and do not come within the designation of the superior court act as city officers."

As tending to show that, under the term, employés, the charter included those who, under other circumstances, would be classed as officers, such as the chiefs of police and fire and other members of those departments, it is evidently contemplated that some designated as employés shall receive salaries, for in the last line of section 17 it is provided: "All salaries and wages of employés shall be fixed by said commissioners." The word, "salary," usually has reference to the remuneration of one who can appropriately be styled an "officer," the word, "wages," applying to the remuneration of laborers. Of course, this distinction might be set aside by law under construction; but we think that in view of the fact that employés were to be appointed for two years, as demanded by the Constitution of Texas for officers, and that

187 S.W.—25

they are to receive salaries, tends strongly to show that by the term, "employés," the charter meant all those officers and members of the different city departments, except daylaborers. The manner of choosing the elective officers had been provided for, the appointive officers had been named, and, unless we find in paragraph 2 of section 16 authority for the nomination and confirmation of those connected with the different departments as employés or officers, there is no nominating authority named in the charter. The powers of the mayor as to proposing the names of officers was fully defined and limited in paragraph one of section 16, and the object of paragraph two was to define the powers of each of the other commissioners as to those who were to execute and perform the duties and functions of each department. Of course, the mayor is granted no authority by paragraph 2.

It is not a question of who are designated as officers and employés in decisions upon different charters and statutes, but as to who are designated as officers and employés under the charter amendment which went into operation on June 1, 1915. The aim and desire in adopting that amendment was to improve the city government and its administration of municipal affairs, and, if the mayor is still the great dispenser of patronage and each department is to be placed in the hands of men chosen by him, if the influence and power of each head of a department is to be curtailed until it would be the greatest injustice to hold him responsible for the administration of the affairs of his department, then some of the main objects of the amendment have been defeated and destroyed. The charter, as construed by appellant, might be aptly denominated rule by an "autocratic mayor" as defined by McQuillin, Mun. Corp. § 93, but would not be a commission government. Under the head of government by "autocratic mayor," the author says he is given not only the veto power, but the sole right to appoint and remove subordinate officials. That is what the people of San Antonio were endeavoring to escape when they adopted the present .charter. This is said by this court with no design of implying that the officials of San Antonio are willfully and knowingly endeavoring to prevent the charter from accomplishing its designed ends. There is no design to assail individuals, but to show the untenability of certain constructions of the charter. As stated by McQuillin in his work on Municipal Corporations, section 92, the essential feature of commission government is to center responsibility and render the officers directly accountable to the people by providing fewer head officers and simplifying municipal administration.

"The work of municipal administration is apportioned among the commissioners (five is the usual number), each being the head of a department for which he is responsible."

That is the kind of government sought by the people of San Antonio and that is what the charter, rightly construed and administered, gives them. It cannot be attained by placing the selection of all appointive officers and employés of each department in the discretion of the mayor. The power of nomination carries with it the power of appointment and the power of appointment of all officers and employés places the practical government of the city in the hands of the mayor. The people had thoroughly tried that form of government and, rightly or wrongly, desired a change.

In the case of Perrett v. Wegner, 139 S. W. 984, the commissioners sought to interfere with the right of the police and fire commissioner to nominate the men who were to serve in his department, and the court, in construing the charter of Galveston, said:

"We think it clear that, construing this section as a whole, it was the intention of the Legislature in its enactment to give to the police and fire commissioner the right to nominate for the office of the chief of police; and, unless such commissioner failed or refused to make such nomination within the time prescribed in said section, the board of commissioners had no right upon the nomination of any other commissioner to appoint any person to said office."

Further, the court stated the axiomatic truth that:

"It is obvious that the good of the department is subserved by entire harmony between the chief and police commissioner, and its efficiency might be greatly lessened by the appointment of a chief objectionable to the police commissioner, and with whom he could not work in harmony."

Co-operation and the utmost harmony between the leader and those he controls are essential to the attainment of efficient service for the public, and in the light of that truth the charter gives the selection of the members of the police and fire forces to the head of the department, who is responsible to the people who elected him. It gives him the selection of all the force and does not perpetrate a joke or enact a farce by giving him the appointment alone of the housesweep, the messenger boy, the scrubwoman, and perchance the janitor, with whom to accomplish the ends for which he was elected, and perhaps have the chief of police and fire chief with all the other members of the department inimical to and arrayed against him.

[5] Appellee prayed that appellant be enjoined and restrained "from proposing, nominating, or appointing any employé in either of the departments of fire or police, and further from submitting any such proposals, nominations, or appointments to said commissioners of San Antonio for their confirmation." The court granted everything asked by appellee, but, in addition, provided that the order of the court should not be construed to apply to the appointment of special policemen temporarily appointed by the mayor as provided in section 25, which was a part of the old charter. There was nothing in the pleadings upon which to base any reference to section 25, and it can be of no importance to appellee whether special policemen should have been excepted or not. If appellee is correct in contending that section 25 was repealed by an adoption of the amendment, then it can be of no importance to any one, and, if it was not repealed, it does not interfere with any authority vested in appellee, for he is not authorized to appoint special policemen. In either event, it is a matter not properly before this court, and it will not go outside the issues made by the pleadings to inquire into the existence or nonexistence of a matter that cannot possibly affect the powers and prerogatives of the commissioner of fire and police.

In enumerating the extraordinary powers given under former charters to the mayor of San Antonio and in making animadversions upon the customs that grew out of it, no reflection upon any person is intended, but the arraignment is of the system and not of individuals; for most men will use the power delegated to them, and a bad system will in the course of events grow out of such unlimited powers placed in the hands of any one man. The people in adopting commission form of government have been attacking a system grown up and nurtured through many years, and not individuals.

The judgment is affirmed.