

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-22-00078-CV

SHANA ELLIOTT AND LAWRENCE KALKE, Appellants

V.

CITY OF COLLEGE STATION, TEXAS; KARL MOONEY, IN HIS
OFFICIAL CAPACITY AS MAYOR OF THE CITY OF COLLEGE STATION;
AND BRYAN WOODS, IN HIS OFFICIAL CAPACITY AS THE CITY MANAGER
OF THE CITY OF COLLEGE STATION, Appellees

On Appeal from the 85th District Court
Brazos County, Texas
Trial Court No. 22-001122-CV-85

Before Stevens, C.J., van Cleef and Rambin, JJ.
Opinion by Justice Rambin

# OPINION

More than a century ago, the Legislature gave Texas cities the ability to regulate matters beyond city limits. The territory subject to such regulation became known as the extra-territorial jurisdiction, or ETJ. In granting ETJ to cities, the Texas Legislature has expressly stated that it does so for the benefit of both city and ETJ residents. *See* TEX. LOC. GOV'T CODE ANN. § 42.001 ("Purpose of Extraterritorial Jurisdiction. The legislature declares it the policy of the state to designate certain areas as the extraterritorial jurisdiction of municipalities to promote and protect the general health, safety, and welfare of persons residing in and adjacent to the municipalities.").

The Appellants, two residents of the ETJ of the City of College Station (City), present a challenge to the very concept of ETJ, or at least to ETJ as historically and currently granted to cities by the Texas Legislature.[1] The challenge being that, unless residents of the ETJ can vote in city elections, any city regulation of the ETJ is void. In the Appellants' words, "Everything in the Texas Bill of Rights 'is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void.'" (Quoting TEX. CONST. art. 1, § 26). "Void" is a strong word in constitutional parlance, because "[a]n unconstitutional statute is void from its inception and cannot provide a basis for any right or relief." *Ex parte E.H.*, 602 S.W.3d 486, 494 (Tex. 2020) (quoting *Reyes v. State*, 753 S.W.2d 382, 383 (Tex. Crim. App. 1988) (en banc)).

---

[1]Originally appealed to the Tenth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001. We are unaware of any conflict between precedent of the Tenth Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

2

The provision of the Bill of Rights of the Texas Constitution that the Appellants invoke is Article I, Section 2, which states:

> All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit. The faith of the people of Texas stands pledged to the preservation of a republican form of government, and, subject to this limitation only, they have at all times the inalienable right to alter, reform or abolish their government in such manner as they may think expedient.

TEX. CONST. art. I, § 2.

Though at times the Appellants couch this as merely a case involving one city and two ordinances, the scope of the relief sought by Appellants is sweeping, as they themselves admitted when requesting oral argument on grounds that this case could "impact both property owners and municipal governments throughout the state of Texas." The case could have such an impact because Appellants bring a facial constitutional challenge to the City's ability to regulate private property outside of its territorial borders. "In a facial challenge, the party challenging the statute claims that the statute *always* operates unconstitutionally." *EBS Sols., Inc. v. Hegar*, 601 S.W.3d 744, 753 (Tex. 2020) (emphasis added).

The Appellants bring their challenge under Article I, Section 2, of the Texas Constitution and not the federal republican-form-of-government guarantee found in the "Guarantee Clause" of Article IV, Section 4, of the Constitution of the United States of America. Appellants assert that, while the United States Supreme Court has found the federal version of the republican-form-of-government guarantee to be a matter for Congress, the Texas version under Article I, Section 2, confers individual rights that can be enforced by the judiciary as a check on the Texas Legislature.

3

The Texas Supreme Court has already spoken to the application of Article I, Section 2, of the Texas Constitution to cities and has also spoken to the application of the republican-form-of-government guarantee under the Constitution of the United States of America. *Brown v. City of Galveston*, 75 S.W. 488, 495–96 (Tex. 1903) (addressing Article I, Section 2); *Bonner v. Belsterling*, 138 S.W. 571, 574–75 (Tex. 1911) (addressing the federal Guarantee Clause).

In both instances, the Texas Supreme Court said that it is for the Texas Legislature, and not for the courts, to determine the type of government afforded at the city level. *Brown* and *Bonner* are rooted in the foundational understanding that cities are not sovereigns unto themselves, but rather are subordinate entities subject to the people of the State of Texas acting as and through their Legislature. That foundation remains solid. *See Town of Lakewood Vill. v. Bizios*, 493 S.W.3d 527, 530 (Tex. 2016) ("Municipalities are creatures of law that are 'created as political subdivisions of the state . . . for the exercise of such powers as are conferred upon them . . . . They represent *no sovereignty distinct from the state* and possess only such powers and privileges as have been expressly or impliedly conferred upon them.'" (emphasis added) (quoting *Payne v. Massey*, 196 S.W.2d 493, 495 (Tex. 1946))).

*Brown* and *Bonner*, though, are more than a century old. Over time, judicial doctrines, such as standing, ripeness, and what is and is not a political question, have been expressed in finer detail by the highest courts of our State and nation. Perhaps *Brown* and *Bonner* were not expressed in the judicial terminology that subsequently developed. As a matter of judicial theory, one could debate whether *Brown* and *Bonner* found the issue of "republican form of government" at the city level to be a political question beyond the judiciary's reach, or on the

4

other hand, those cases found the issue to have been within the judiciary's reach, but then made judicial pronouncements that Legislative authority over the form of city government, as exercised in those cases, was consistent with a constitutional "republican form of government."

Either way, the Texas Supreme Court has spoken clearly that the matter is committed to the Legislature. The Legislature has relied on that word for more than a century, via numerous statutory grants, modifications, and withdrawals of ETJ authority to the cities. For us, on this case, that is the end of the matter.

Justiciability requires careful case-by-case analysis, but it is largely a matter of separation of powers. One of the considerations in the justiciability analysis (in its present-day articulation) is whether the relief sought can be "judicially molded." *Am. K-9 Detection Servs., LLC v. Freeman*, 556 S.W.3d 246, 252 n.18 (Tex. 2018) (quoting *Baker v. Carr*, 369 U.S. 186, 198 (1962)).

Given the longstanding Texas Supreme Court rulings in this field, we see no way that the trial court, or an intermediate court of appeals, such as this Court, could set *Brown* aside to mold the relief presently requested. Accordingly, for reasons discussed below, we affirm the trial court's dismissal of this case on a plea to the jurisdiction.

## I. Factual and Procedural Background

Shana Elliott and Dr. Lawrence Kalke (Appellants) own separate properties within the ETJ of the City. It is undisputed that, as residents of the ETJ, they cannot vote in city elections. Elliott and Kalke assert that they want to take certain actions on and regarding their property and that the city has ordinances in place prohibiting those actions. Elliott and Kalke sued the City,

5

the City's mayor, and the City's manager (collectively Appellees). The suit challenged two ordinances of the City on the following single legal theory: "This case presents a facial Constitutional challenge under Article 1, Section 2 of the Texas Constitution, [to] College Station's decision to regulate the persons and property outside of their city limits." Elliott and Kalke contended that, because ETJ residents cannot vote in the City's election, any regulation of the ETJ by the City should be declared "unconstitutional"[2] and that a permanent injunction should issue "enjoining the application of College Station's code of ordinances against Plaintiffs' properties located outside of College Station's city limits." At core, though, their suit is about more than ordinances, as Elliott and Kalke seek "a declaration that College Station lacks constitutional authority to regulate persons and private property beyond its city limits."

The City and its officials brought a plea to the jurisdiction, asserting that Elliott and Kalke lacked standing, that their claims were not ripe, and that the suit presented a political question.[3] Elliott and Kalke opposed the plea to the jurisdiction and every ground asserted therein. The trial court permitted discovery, including the deposition of the city manager. The trial court held a hearing on the plea to the jurisdiction on September 15, 2022, and on the next day, granted the plea, dismissing the case.

The challenged ordinances concern two subjects: "off-premise" signs, and driveways. Concerning signs, Section 7.5(CC) of the City's Unified Development Ordinance (UDO)

---

[2]On appeal, Elliott and Kalke express this in terms of city regulation of the ETJ being void pursuant to Article 1, Section 26, of the Texas Constitution. *See* TEX. CONST. art. 1, § 26 ("Everything in the Texas Bill of Rights 'is excepted out of the general powers of government, and shall forever remain inviolate, and all laws contrary thereto, or to the following provisions, shall be void.").

[3]Because we resolve the case on other grounds, we do not address the questions of standing and ripeness.

6

provides, "All off-premise and portable signs shall be prohibited within the Extraterritorial Jurisdiction of the City of College Station." CITY OF COLL. STATION, TEX., UNIFIED DEV. CODE sec. 7.5(CC) (2023). "Off-premise" is a term of art in the signage field, referring to signs physically located on one place that direct the reader to another place. *City of Austin, Tex. v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1475 (2022) ("[F]or the last 50-plus years, federal, state, and local jurisdictions have repeatedly relied upon on-/off-premises distinctions to address the distinct safety and esthetic challenges posed by billboards and other methods of outdoor advertising."). Concerning driveways, Section 34-36(b)(3) of the City of College Station Code of Ordinances states, "Any property owner desiring a new driveway approach or an improvement to an existing driveway at an existing residential or other property shall make application for a driveway permit . . . ." CITY OF COLL. STATION, TEX., CODE OF ORDINANCES sec. 34-36(b)(3) (2023). This restriction applies to "all streets, sidewalks, and driveways within the corporate limits of the City . . . and within the extraterritorial jurisdiction of the City." CITY OF COLL. STATION, TEX., CODE OF ORDINANCES sec. 34-31 (2023).

The Texas Legislature has limited the City's enforcement mechanism for a range of matters in the ETJ, including driveways, to a suit for injunction. *See* TEX. LOC. GOV'T CODE ANN. §§ 212.002, 212.003(b), (c) ("A fine or criminal penalty prescribed by the ordinance does not apply to a violation in the extraterritorial jurisdiction." "The municipality is entitled to appropriate injunctive relief in district court to enjoin a violation of municipal ordinances or codes applicable in the extraterritorial jurisdiction."). The City has, by Section 10.3 of its UDO, made a suit for injunctive relief the sole enforcement mechanism for any ordinance violation in

7

the ETJ. CITY OF COLL. STATION, TEX., UNIFIED DEV. CODE sec. 10.3(B) (2023) ("Any person violating any provision of this UDO, outside the corporate limits of the City, but within the City's extraterritorial jurisdiction, shall not be considered as committing a misdemeanor, nor shall any fine provided in Section A above be applicable; however, the City shall have the right to institute an action in a court of competent jurisdiction to enjoin the violation of any provision of this UDO.").

The City did not sue Elliott or Kalke over the ordinances at issue. Instead, the City asserts that it has never sued anyone "similarly situated" to Elliott and Kalke over the ordinances at issue, with the City considering "similarly situated" to be residential property owners in the ETJ. Though the City contends that it does not enforce the challenged ordinances, it would not go so far as to say that they do not apply to Elliott and Kalke, nor would the City commit to never enforcing them. The following exchange from the deposition of the city manager aptly summarizes the state of affairs:

> Q. . . . . I'm asking about the choice that you used the word enforce but you didn't use the word apply.
> So, my question is, is your position you do not enforce any ordinances?
>
> A. Yes. My position is that we do not enforce those ordinances.
>
> Q. Are you claiming that there are no ordinances that could apply to them?
>
> A. I'm not claiming that there are no ordinances that -- no, I'm not claiming that. I'm -- exactly what I said, that we don't enforce the ordinances.
>
> Q. Okay. As city manager, is your decision not to enforce an ordinance permanently binding on the city?

A.      No.

Q.      Okay.   So, a future city manager could come to a different conclusion about enforcement?

A.      Correct.

Q.      Okay.   In fact, you could change your mind about enforcement, correct?

A.      Correct.

On the other hand, both Elliott and Kalke admit that they have not taken any concrete steps towards the realization of their desires.   Neither has applied for a driveway permit.   Neither has turned so much as a spade of soil for a driveway.   Neither has bought so much as a posterboard or a paintbrush for a sign.

On these facts, the parties are at loggerheads on the law.   The City contends that "[t]he Texas Legislature has granted authority to Texas cities to regulate certain activities in nearby areas outside their corporate boundaries."   In the City's view, this presents the following political question:  "Whether Texas municipalities should be afforded that authority is a question for the Legislature, not the courts."   In support of this contention, the City cites to numerous acts regarding extraterritorial jurisdiction, including Chapters 42, 212, 216, and 217 of the Local Government Code.   Elliott and Kalke, on the other hand, consider the City's view to be unsupported.   Elliott and Kalke assert:  "[T]he City's arguments regarding the political question doctrine boil down to a single, unsupported claim:   that the legislature has granted cities the authority to regulate in the ETJ and therefore it is not for the courts to second guess whether such authority is constitutional."

9

Both sides cite authorities on these subjects, authorities that we now address.

## II.      The Nature of Texas Cities

At core, *Brown* and *Bonner* dealt with the foundational essence of Texas cities.  This was a question hotly debated in the early 1900s, as the civil and criminal enforcement of the ordinances of growing cities increasingly overlapped with the laws of the Texas Legislature.  Or in the tragic case of the Great Galveston Hurricane of 1900, the question was brought to the fore when the extensive loss of life resulted in the Texas Legislature providing that the governor could appoint new city commissioners who, after a term of two years, would then be subject to election.  *See, e.g.*, *Brown*, 75 S.W. at 489–90.  In several cases, challenges to the civil or criminal enforcement of a city ordinance took the form of a challenge to the constitutionality of the city government on the theory that, if the government was unconstitutional, the ordinance was void.

One view, the view espoused by the Texas Court of Criminal Appeals in *Ex parte Lewis*, was that the notion of cities (and some actual cities), predated the State of Texas, and even the Republic of Texas, and that all cities therefore drew upon a common-law source of authority inherent (if not expressed) in the Texas Constitution.  *Ex parte Lewis*, 73 S.W. 811, 818 (Tex. 1903).  In the words of the Texas Court of Criminal Appeals:

> The fact that a system of municipal government was long in vogue prior to the enactment of the [Texas] Constitution, and that under this system, from time immemorial, local self-government was recognized, and the power of the suffragans in cities to elect their own municipal officers was conceded, and that nowhere and at no time had the power ever been claimed on the part of the Legislature to interfere by authorizing the Governor to appoint local municipal officers, must afford strong evidence of an existing condition which would indicate that there was no purpose on the part of those who framed our organic

10

law to destroy a system of municipal government which had always heretofore been recognized.

*Id.* at 817.

*Ex parte Lewis* went before the Texas Court of Criminal Appeals because a resident of Galveston emptied out a "privy or water-closet" at a time and or place prohibited by an ordinance of the City of Galveston, was fined, then jailed for failure to pay the fine, and then challenged his punishment on grounds that "the Governor ha[d] no authority, under the Constitution of this state, to appoint the members of [the city's] board, and that the charter provision authorizing him to do so [was] null and void, and that said ordinance, and all proceedings thereunder, [were] without authority of law." *Id.* at 811. The Texas Court of Criminal Appeals agreed, holding:

> [T]he mayor and board of aldermen of said city were elective officers under and by virtue of our Constitution, and . . . the majority of these, in the face of our traditions and of the organic law itself, having been appointed by the Governor, any law or ordinance passed by them was without authority, inasmuch as they were not officers of the municipality, and could not, under our Constitution, be such.

*Id.* at 819.

Another argument made by *Ex parte Lewis* had to do with the then-current version of Article VI, Section 3, of the Texas Constitution, which provided that all "qualified electors" who had resided in a city for six months could vote in a city's elections, including for mayor, provided that only those paying property taxes could vote on the "expenditure of money or the assumption of debt." From the existence of this constitutional provision, *Ex parte Lewis* concluded, "To hold that the Constitution makers undertook the task of defining qualifications of

11

voters in cities, and providing that persons possessing the enumerated qualifications should have the right to vote for mayor and other elective officers, and then to decide, without any express provision of the Constitution on the subject, that the Legislature should have the power to withhold this right to vote in cities, would, in our opinion, be a travesty on constitutional construction." *Id.* at 818.

Ultimately, *Ex parte Lewis* was a policy-based plea for local control:

It may be that here and there, under our American system, cities may be given over to corruption, and lawless elements permitted to run riot over the best interests of the municipality, but this can only be temporary. If we adhere rigidly to the principles of local self-government, in the end conservatism and enlightenment and American citizenship will triumph. But if this incentive on the part of the better classes for good government is removed, and localities taught to depend on some central power to take care of them, we may never expect an improvement. On the contrary, the seeds of our free institutions, planted by the fathers in the townships and municipalities, will be scattered to the winds, anarchy will run riot throughout the entire body politic, while we look in vain for some strong central power to arrest the destruction of our liberties which have rested hitherto upon that vital and essential principle of the republic-local self-government by the people.

*Id.*

Another view was expressed by the dissenter in *Ex parte Lewis*. Under this view, "municipal governments are the bare creatures of the Legislature. The legislative breath has made them, and the legislative breath can unmake them." *Id.* at 826 (Brooks, J., dissenting). Under this view, "there is nothing in the letter or spirit of the [Texas] Constitution that remotely infringes upon the legislative right to create the charter with appointive officers for the stricken city of Galveston." *Id.* at 827.

12

The Texas Supreme Court also heard a post-hurricane challenge to the form of Galveston's government. The Texas Supreme Court came down on the side of cities being the creations of the Legislature and, in so doing, expressly (though reluctantly) disagreed with the Court of Criminal Appeals. *Brown*, 75 S.W. at 491, 494.[4]

As with *Ex parte Lewis*, *Brown* dealt with a challenge to the appointment of city commissioners by the governor, as authorized by the new city charter created by an act of the Texas Legislature. *Id.* at 489–90, 491 ("The first question submitted to us involves the constitutionality of those sections and provisions of the charter of the city of Galveston which empower the Governor of the state to appoint three members of the governing board of commissioners for that city, and of those which invest that commission so constituted with the powers of mayor and board of aldermen."). The case went up the civil ladder of the Texas judiciary because the plaintiffs there sought civil injunctive relief against Galveston city ordinances imposing a license requirement on those operating vehicles in the city, with the cost of a license being on a sliding scale based on the type of use and the number of horses or other animals used to pull the vehicle. *Id.* at 490–91.

*Brown* took a statewide view of things and, in so doing, presented an analysis of first principles.

---

[4]The court in *Brown* began its analysis by observing: "Recognizing the equal authority and dignity of [the Court of Criminal Appeals], we approach the investigation of the question with much hesitancy, because of the delicacy of the duty to be performed. We shall accord to the opinion of the majority in that case equal weight as an authority with that of any other court of last resort, and, because it is a court of co-ordinate powers with this, acting under authority derived from the same Constitution, we feel constrained to conform our opinion to that, if we can properly do so in the discharge of our duty." *Brown*, 75 S.W. at 491.

The Texas Constitution begins with this:

> That the general, great and essential principles of liberty and free government may be recognized and established, we declare:

> Section 1. Texas is a free and independent State, subject only to the Constitution of the United States, and the maintenance of our free institutions and the perpetuity of the Union depend upon the preservation of the right of local self-government, unimpaired to all the States.

TEX. CONST. art. I, § 1.

*Brown* held that "local self-government" in Article I, Section 1, refers to *the entire state*. "[T]he declaration of the right of local self-government has reference to the people of the state, and not to the people of any portion of it." *Brown*, 75 S.W. at 495. The term "the people," however, does not appear in Article I, Section 1.

*Brown* next addressed Article I, Section 2, of the Texas Constitution, which does refer to "the people":

> All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit. The faith of the people of Texas stands pledged to the preservation of a republican form of government, and, subject to this limitation only, they have at all times the inalienable right to alter, reform or abolish their government in such manner as they may think expedient.

TEX. CONST. art. I, § 2.

*Brown* took a statewide view of this section as well, holding that Article I, Section 2, "does not mean that political power is inherent in a part of the people of a state, but in the body who have the right to control, by proper legislation, the entire state and all of its parts." *Brown*, 75 S.W. at 495.

14

*Brown* then turned to Article II and the separation of powers.  Article II, Section 1, states:

§ 1.  Separation of powers of government among three departments

The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit:  those which are Legislative to one, those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.

TEX. CONST. art. II, § 1.

Here too, *Brown* continues the stark conceptual turn from *Ex parte Lewis*.  *Brown* held that Article II, Section 1, "distributes the powers of government—the powers which reside in the people—into three departments."  *Brown*, 75 S.W. at 495.  By reference to "the people," a term that does not appear in Article II, Section 1, *Brown* brings its analysis of Article I, Section 2, to bear:

By organizing into a state, with its different departments empowered to exercise the authority of the people in the administration of their affairs, *the people did not part with their power; it remains with them*, to be exercised by the departments according to the limitations and provisions which are expressed or implied in the Constitution for their government and direction.

*Id.* (emphasis added).

*Brown*'s analysis then moves to Article III, Section 1, which provides:  "The Legislative power of this State shall be vested in a Senate and House of Representatives, which together shall be styled 'The Legislature of the State of Texas.'"  *Id.* (quoting TEX. CONST. art. III, § 1).  *Brown* brings the statewide concept of "the people" from Articles I and II to bear on the nature of the Article III "Legislative power" as follows, "'The legislative power of this state' means *all of the power of the people* which may properly be exercised in the formation of laws against which

15

there is no inhibition expressed or implied in the fundamental law." *Brown*, 75 S.W. at 495

(emphasis added). The "fundamental law" as used in that sentence means the Texas

Constitution. *See id.* at 494 ("We have been taught to regard the state and federal constitutions

as the sole tests by which the validity of the acts of the legislature are to be determined."

(quoting *Redell v. Moores*, 88 N.W. 243, 247 (Neb. 1901))).

Having set forth those underpinnings in Texas Constitution Article I, Sections 1 and 2,

Article II, Section 1, and Article III, Section 1, *Brown* comes to the heart of the matter:

> Since a municipal corporation cannot exist except by legislative authority, can
> have no officer which is not provided by its charter, and can exercise no power
> which is not granted by the Legislature, it follows that *the creation of such
> corporations, and every provision with regard to their organization, is the
> exercise of legislative power which inheres in the whole people, but by the
> Constitution is delegated to the Legislature*; therefore it is within the power of the
> Legislature to determine what form of government will be most beneficial to the
> public and to the people of a particular community.

*Brown*, 75 S.W. at 495–96 (emphasis added).

*Brown* then went on to use "the doctrine" to refer to, and to reject, the position advanced

by *Ex parte Lewis*, namely the position that cities, i.e., a subset of "the people," have rights from

a source that is not expressed in the Texas Constitution. *Id.* at 494 ("the doctrine announced by

the Court of Criminal Appeals in *Ex parte Lewis*"),[5] 496. *Brown* specifically rejected the idea

---

[5]The Texas Supreme Court identified "the doctrine" in even greater detail:

> It is asserted by the appellant that the people of Galveston had the 'inherent right' to select their
> own municipal officers, and that the Legislature had no power to authorize the Governor of the
> state to appoint municipal officers for that city. This proposition seems to be supported by the
> majority opinion in the case of *Ex parte Lewis*, 73 S.W. 811, from which we quote. After citing a
> number of cases, the Court of Criminal Appeals said: 'But the reasoning in all of the cases—those
> referred to as well as all others—to which our attention has been called, except *State of Nevada v.
> Swift*, 11 Nev. 134 [Nev. 1876], strongly supports the proposition that, even without some express
> constitutional provision, neither the Legislature nor the Governor has the power to appoint the

that independent municipal authority could be found in "the principles of natural justice" or in "natural justice," or in a "spirit supposed to pervade the Constitution, but not expressed in words." *Id.* at 496.

*Brown* buttressed its position with several observations.

For one, the Texas Supreme Court noted, "Our Constitution is distinguished for the particularity of its provisions and the details into which it enters in reference to matters of government." *Id.* at 493. In particular, the Texas Constitution specified the officers and manner of election for county officials but did not do so for cities. *Id.* (citing then-current TEX. CONST. art. XI). From this the *Brown* court concluded, "It is significant that the Legislature was thus left free to choose the form of government for cities and towns in contrast with the particular provisions for counties." *Id.*

The Texas Supreme Court also addressed the Article VI, Section 3, argument made by *Ex parte Lewis*. *Brown* agreed that Article VI, Section 3, of the Texas Constitution addressed who could vote in municipal elections, *if* they were held. *Brown*, 75 S.W. at 493 ("The purpose of this section is to secure to all electors of the state residing in cities and towns the right to vote at all elections for elective officers of such corporations, and to secure to property taxpayers the right to determine questions of the expenditure of money and the assumption of debts, *when submitted to a vote*." (emphasis added)). But *Brown* considered it a leap for *Ex parte Lewis* to

---

permanent officers of a municipality. In the cases cited it occurs to us that the real effect of the decisions was to establish *the doctrine* that, in the absence of a grant of authority in the Constitution authorizing the appointment of such local officers by the Legislature or the Governor, this power was denied by implication arising from the history and traditions which time out of mind had conferred local self-government on municipalities.'

*Brown*, 75 S.W. at 494 (emphasis added).

17

find that mayoral elections *must* be held, because that same logic applied to the same constitutional provision would result in every little thing having to do with city finances requiring an election. *Id.* *Brown* found support in this reasoning from the existence of other constitutional provisions requiring a vote on particular matters of local finances, because provisions requiring elections on particular matters would be wholly unnecessary if Article VI, Section 3, had the broad ramifications ascribed to it by *Ex parte Lewis*. *Id.*[6] The Texas Supreme Court granted that there was, perhaps, room for difference of opinion on the import of Article VI, Section 3, regarding "republican form of government," but not enough room to overturn an act of the Texas Legislature. *Id.* at 493–94.[7]

Further, the legislation creating the post-hurricane city charter was largely the result of a bill sponsored by the state representatives and the state senator representing Galveston. *Id.* at 496. Therefore, to set that legislation aside would be to "deny to the people of Galveston the right to govern their affairs their own way, and thereby to substitute a form of municipal government dictated by the courts." *Id.*

---

[6] "The fact that the Constitution directs that all propositions to levy taxes to support public free schools in cities and towns shall be submitted to a vote of the property tax payers (article 11, §§ 7 and 10; article 7, § 3) shows that the convention did not understand that section 3, art. 6, embodied such requirements, else the special provisions would be useless." *Brown*, 75 S.W. at 493.

[7] The majority opinion [of *Ex parte Lewis*] argues with much force the proposition that the charter of Galveston is in conflict with section 3 of article 6 of the Constitution, but we do not believe that it is so conclusive as to justify this court in overruling the decision of the legislative department. If there was doubt in our minds, our conclusion must be as expressed in the following quotation: 'But if I could rest my opinion in favor of the constitutionality of the law on which the question arises on no other ground than this doubt so felt and acknowledged, that alone would, in my estimation, be a satisfactory vindication of it. It is but a decent respect due to the wisdom, the integrity, and the patriotism of the legislative body by which any law is passed to presume in favor of its validity, until its violation of the Constitution is proved beyond all reasonable doubt.'

*Id.* at 493–94.

In closing, *Brown* cautioned that the *Ex parte Lewis* approach presented a vague and unmanageable standard that was an invitation to judicial overreach:

> "The doctrine" furnishes no standard or rule by which to determine the validity of any law framed by the Legislature, but leaves each judge to try it according to his own judgment of what constitutes the "history and traditions" of the state, and what rights have been vested in the people by reason of such "history and traditions." To this theory we cannot give our consent, but must adhere to the well-established rules of construction which confine the court to the Constitution as the standard by which it is to determine the validity of legislative enactments.

*Brown*, 75 S.W. at 496.[8]

Thus, there was an unfortunate split between the State's two highest courts, as recognized by *Commissioners' Court of Nolan County v. Beall*, 81 S.W. 526, 528 (Tex. 1904).[9] *See also Ex parte Anderson*, 81 S.W. 973, 974 (Tex. 1904).

---

[8]*Brown* dealt with the additional question of whether the fees charged by the ordinance were a proper exercise of police power or an impermissible occupation tax. *Id.* at 496–97.

[9]The *Beall* court observed:

> [I]n ordinary cases there could be no conflict between the Court of Criminal Appeals and the Supreme Court; it being the duty of the latter to follow the former on questions of criminal law, and the corresponding duty of the former to follow the latter upon questions of civil law. So far harmony of decision was secured. But unfortunately there is a class of cases in which this rule cannot be applied. For example, the Legislature may pass a statute which both confers civil rights, and declares offenses punishable in the criminal courts, the validity of which as a whole may be questioned. Under such a law both a civil action may be brought, and a criminal prosecution instituted. The question of the validity of the act is peculiar to neither jurisdiction. Under it, if valid, there are not only civil rights to be protected, but also criminal offenses to be prosecuted. Upon the question of the validity of the act neither court should be bound by the decision of the other. Such was the act, the validity of which was passed upon by this court in the case of *Brown v. City of Galveston*, 75 S.W. 488, 7 Tex. Ct. Rep. 758. In that case we were called upon to determine the right of the city government of the city of Galveston to maintain itself under the act in question, and, not considering this court bound by the decision of the Court of Criminal Appeals in the case of *Ex parte Lewis* (Tex. Cr. App.) 73 S.W. 811, we declined to follow it. No more do we think that the Court of Criminal Appeals were bound by our decision upon that question. Therefore as to that class of cases there may be conflict between the decisions of the two courts, and there is no provision in the Constitution for settling the law in such cases and enforcing harmony of decision.

*Beall*, 81 S.W. at 528.

Thankfully, by 1909, there was, if not harmony, at least détente between the courts, because the Texas Court of Criminal Appeals abandoned the approach of municipalities being separate sovereigns. The Texas Court of Criminal Appeals held, "*Municipal corporations have only such powers as may be granted by the Legislature*, unless otherwise provided in the Constitution; and wherever the question of a grant of power is at issue, the grant will be taken more strongly in favor of the granting power, and against the grantee, when application of this principle is made to municipal corporations." *Mantel v. State*, 117 S.W. 855, 856 (Tex. Crim. App. 1909) (emphasis added). The case in which the Texas Court of Criminal Appeals so held was not a republican-form-of-government challenge, but it did call on the Texas Court of Criminal Appeals to assess the authority of cities as compared to the Legislature. At issue in *Mantel* were overlapping versions of food safety regulations, each with differing penalties: the ordinance of the City of Dallas, and the statutes of the State of Texas. The Texas Court of Criminal Appeals found, "The city ordinance seems to be sweeping enough to cover all the provisions of the state law, without drawing any distinction as to the character of foods which may be adulterated or the manner of adulteration, in so far as punishment is concerned." *Id.* at 857. The Texas Court of Criminal Appeals further found that "the punishment for violation of the city ordinance [was] different from that prescribed for violation of the state law." *Id.* Consequently, the ordinance had to yield because "city ordinances are justified by virtue of the authority granted in the charter[,]" which "is derived from the Legislature, and the power of the city government to create or ordain ordinances is by virtue of authority granted by the Legislature." *Id.* The Texas Court of Criminal Appeals observed, "[I]t is well within the power

20

of the city of Dallas, by ordinance duly passed, to adopt such ordinances as may be appropriate to protect the public health, *subject, always, that they be in conformity with the state law on the same subject*." *Id.* (emphasis added). The Texas Court of Criminal Appeals cited neither *Brown* nor *Ex parte Lewis* in this decision.

A little more than two years after *Mantel*, the Texas Supreme Court was again faced with a republican-form-of-government challenge. *Bonner v. Belsterling*, 138 S.W. 571, 573 (Tex. 1911). The case was brought by a member of the board of education of the City of Dallas who had been removed via a recall election. *Id.* There was no dispute that the City of Dallas derived its powers from a charter granted by the Texas Legislature. *Id.* at 573. Nor was there any dispute that the city's government was republican in nature, save and except for the dispute over the Legislature's grant of the recall power, which was challenged not under Article I, Section 2, of the Texas Constitution but under the Guarantee Clause of Article IV, Section 4, of the United States Constitution. *Id.* at 574. The Texas Supreme Court, quoting Thomas Jefferson, noted the difficulty in pinning down what is meant by a "republican form of government":

> As to the meaning of the phrase, 'Republican form of government,' there is no better authority than Mr. Jefferson, who, in discussing the matter, said: 'Indeed, it must be acknowledged that the term 'republic' is of very vague application in every language. Were I to assign to this term a precise and definite idea, I would say, purely and simply, it means a government by its citizens in mass, acting directly and not personally, according to rules established by the majority; and that every other government is more or less republican in proportion as it has in its composition more or less of this ingredient of the direct action of the citizens.

*Bonner v. Belsterling*, 138 S.W. 571, 574 (Tex. 1911) (quoting Letter from Thomas Jefferson to John Taylor (May 28, 1816), NATIONAL ARCHIVES, https://founders.archives.gov/documents/ Jefferson/03-10-02-0053).

21

The Texas Supreme Court, citing *Brown*, held that, subject to the Constitutions of the United States and the State of Texas, "the people of Texas have the right to adopt any form of government which they may prefer" and that "the Legislature may confer upon any municipal government any power that it may see fit to give." *Id.* at 574 (citing *Brown*, 75 S.W. 488). Consequently, "[t]he policy of reserving to the people such power as the recall, the initiative, and the referendum is a question for the people themselves in framing the government, or *for the Legislature* in the creation of municipal governments. *It is not for the courts to decide that question.*" *Id.* at 574–75 (emphasis added).[10] *Bonner* went on to observe that "we are unable to see from our viewpoint" how the ability to hold recall elections would make the city's board of education less republican. *Id.* at 574.

In 1912, on the heels of all the decisions cited above, the Texas Constitution was amended to permit cities to adopt their own charters. This power, though, came with limitations:

> Cities having more than five thousand (5000) inhabitants may, by a majority vote of the qualified voters of said city, at an election held for that purpose, adopt or amend their charters, subject to such limitations as may be prescribed by the Legislature, and providing that no charter or any ordinance passed under said charter shall contain any provision inconsistent with the Constitution of the State, or of the general laws enacted by the Legislature of this state . . . .

Tex. H.J. Res. 10, 32d Leg., R.S., 1911 Tex. Gen. Laws 284–85 (proposing constitutional amendment, which passed, to Article XI, Section 5, of the Texas Constitution relating to amendment of city charters).

---

[10]It is worth noting that *Bonner* cited *Brown* for the rule that the Legislature determines the form of municipal government, but after that, let things be. *Bonner* did not expound upon *Brown*, nor did *Bonner* undertake to refute *Ex parte Lewis*. This is consistent both with *Ex parte Lewis* being a dead letter on the subject and with *Bonner* seeking to clearly affirm the validity of *Brown* but to do so quietly and respectfully.

Shortly after the adoption of that amendment, the Texas Legislature passed an enabling act that placed restrictions on such "home rule" cities. *See, e.g.*, *McCutcheon v. Wozencraft*, 294 S.W. 1105, 1106 (Tex. 1927). In *McCutcheon* a would-be city bus operator was denied a franchise by the city commission of Dallas (then a home rule city). *Id.* at 1105. The would-be bus operator sought mandamus relief to compel the city to put the question to the voters. *Id.* The Texas Supreme Court denied that relief, holding that the Legislature's enabling act did indeed include a provision for submitting city decisions to the voters, but as a safeguard mechanism to permit voters to reject franchises actually granted by the city's governing body, not as a means to second-guess the governing body's rejection of a franchise. *Id.* at 1107.

In the case now before us, the City is a home rule city. However, neither side in this case argued that home rule status impacted the analysis. Perhaps that is because the Texas Supreme Court—while recognizing the constitutional source of home rule power—has nonetheless held that all cities in Texas remain subdivisions of the state that "represent no sovereignty distinct from the state and possess only such powers and privileges as have been expressly or impliedly conferred on them." *Town of Lakewood Vill.*, 493 S.W.3d at 530 (quoting *Payne*, 196 S.W.2d at 495). As a result, the conceptual underpinning of *Brown* and *Bonner* remains solid.

## III. Extraterritorial Jurisdiction

With an understanding of the nature of cities established, we turn next to the extraterritorial jurisdiction of cities. The discussion of cities was necessary because both sides agree that there is no prior case presenting a republican-form-of-government challenge to extraterritorial jurisdiction and because, for lack of such a case, both sides cite to cases involving

23

cities (namely *Ex parte Lewis*, *Brown*, and *Bonner*) in their arguments regarding the extraterritorial jurisdiction. Those cases are discussed above. What we turn to, then, is the source of extraterritorial authority. On this, both sides agree that extraterritorial jurisdiction is a statutory creation of the Texas Legislature. "A city's authority to regulate land development in its ETJ is wholly derived from a legislative grant of authority." *Town of Annetta S. v. Seadrift Dev., L.P.*, 446 S.W.3d 823, 826 (Tex. App.—Fort Worth 2014, pets. denied) (quoting *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 902 (Tex. 2000) (Abbott, J., dissenting)).

The Texas Legislature has granted cities in Texas the authority to regulate certain activities outside their corporate boundaries, in what is known as their extraterritorial jurisdiction. The Texas Legislature "declare[d] it the policy of the state to designate certain areas as the extraterritorial jurisdiction of municipalities." TEX. LOC. GOV'T CODE ANN. § 42.001. Extraterritorial jurisdiction refers to "the unincorporated area that is contiguous to the corporate boundaries of the municipality" and is located within a specified distance of those boundaries, depending upon the number of inhabitants within the municipality.[11] TEX. LOC. GOV'T CODE ANN. § 42.021. The purpose of extraterritorial jurisdiction is "to promote and protect the general health, safety, and welfare of persons residing in and adjacent to the municipalities." TEX. LOC. GOV'T CODE ANN. § 42.001. Subject to certain exceptions, the Legislature has authorized cities to regulate the subdivision of land and access to public roads within their ETJ. TEX. LOC. GOV'T CODE ANN. § 212.003. The Legislature has also authorized cities to extend their sign regulations

---

[11]The extent of a particular city's ETJ depends on the size of that city's population. TEX. LOC. GOV'T CODE ANN. § 42.021. For cities with populations exceeding 100,000, such as the City, the ETJ extends five miles from the city's boundaries. TEX. LOC. GOV'T CODE ANN. § 42.021(a)(5).

24

to their ETJ and regulate certain nuisances within a defined area outside the city limits. TEX. LOC. GOV'T CODE ANN. §§ 216.003, 217.042. In some shape or form, cities have had extraterritorial powers since at least 1913.[12]

## IV. Plea to the Jurisdiction

"A plea to the jurisdiction is a dilatory plea" by which a party challenges a court's authority to determine the subject matter of the action. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). We review the trial court's ruling on a challenge to its subject-matter jurisdiction de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 228 (Tex. 2004).

If a plea to the jurisdiction challenges a party's pleadings, the reviewing court examines whether the pleader affirmatively alleged facts establishing jurisdiction. *Tex. Dep't of Crim. Just. v. Rangel*, 595 S.W.3d 198, 205 (Tex. 2020). When examining whether the pleader has met this burden, the reviewing court looks to the pleader's intent, construing the pleadings liberally, and taking all factual assertions as true. *Id.*

If the facts regarding the jurisdictional issue are undisputed, or fail to raise a fact question, then the plea to the jurisdiction becomes a question of law. *Miranda*, 133 S.W.3d at 228. "If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend." *Id.* at 227.

---

[12]*See* Act approved April 7, 1913, 33d Leg., R.S., ch. 147, § 4, 1913 Tex. Gen. Laws 307, 310 ("That each city shall have the power to *define all nuisances* and prohibit the same within the city and *outside the city limits for a distance of five thousand feet*; to have the power to police all parks or grounds, speedways, or boulevards owned by said city and lying outside of said city . . . ." (emphasis added)).

## V. Political Question

As stated at the outset, appellants present a facial challenge to the City's ordinances, arguing that they violate the "republican form of government" requirement found in Article I, Section 2, of the Texas Constitution. Facial constitutional challenges are "disfavored because they threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *King St. Patriots v. Tex. Democratic Party*, 521 S.W.3d 729, 741–42 (Tex. 2017) (citation omitted). The Appellants contend that the City ordinances at issue violate Article I, Section 2, of the Texas Constitution because Appellants reside in the City's ETJ and are "subject to the municipality's regulatory authority but [are] denied the ability to vote to remove the holder of legislative power from office."

In Texas, "[s]ubject[-]matter jurisdiction requires . . . that the case be justiciable." *State Bar of Tex. v. Gomez*, 891 S.W.2d 243, 245 (Tex. 1994). The political question doctrine "is primarily a function of the separation of powers" and excludes from judicial review controversies that "revolve around policy choices and value determinations constitutionally committed for resolution" to non-judicial government branches. *Am. K-9*, 556 S.W.3d at 253. "The political question doctrine is an issue of subject-matter jurisdiction, and thus a party properly asserts it in Texas state court via a plea to the jurisdiction." *Van Dorn Preston v. M1 Support Servs., L.P.*, 642 S.W.3d 452, 459 (Tex. 2022). "Whether the jurisdictional facts establish trial-court jurisdiction is a question of law that [is] review[ed] de novo." *Id.*

26

In *Baker v. Carr*, the United States Supreme Court set out six factors for identifying issues that have been committed to another branch of government:

> It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217 (1962).

However, as stated in *Baker*, the political question doctrine "is one of 'political questions,' not one of 'political cases.' The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority." *Id.*

The Texas Supreme Court has never explicitly adopted the entirety of the *Baker* test, but it has "assumed" that the *Baker* factors "serve equally well in defining the separation of powers in the state government under the Texas Constitution." *Am. K-9*, 556 S.W.3d at 253 (quoting *Neeley v. W. Orange-Cove Consol. Ind. Sch. Dist.*, 176 S.W.3d 746, 778 (Tex. 2005)). The Texas Supreme Court has also been "guided" by *Baker* in cases implicating both federal and state authority. *Id.* at 254; *Van Dorn Preston*, 642 S.W.3d at 458–59 ("This case presents a

27

similar state-federal dynamic. The claims presented are ones over which the federal courts have concurrent jurisdiction, and we apply *American K-9*'s analysis, guided by federal precedent, to inform our decision.").

American K-9*, though guided by *Baker*, was decided as a matter of "the separation of powers mandated by the Texas Constitution." *Am. K-9*, 556 S.W.3d at 254. In this context, *American K-9* incorporated the "discriminating analysis" described by *Baker*. *Id.* at 257 (quoting *Baker*, 369 U.S. at 211). In full, the *Baker* discriminating analysis is as follows:

> Our cases in this field seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action.

Baker*, 369 U.S. at 211–12. In regard to the "susceptibility to judicial handling," *American K-9* noted that, in the federal system, *Baker* treated justiciability issues such as "whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded," as a question separate from jurisdiction, but in Texas "[s]ubject[-]matter jurisdiction requires . . . that the case be justiciable." *Am. K-9*, 556 S.W.3d at 252 n.18 (quoting *Baker* 369 U.S. at 198; *Gomez*, 891 S.W.2d at 245).

In the same context, i.e., being guided by *Baker* when deciding an issue under the Texas Constitution, *American K-9* looked specifically to the first two *Baker* factors, namely, whether there was "a textually demonstrable constitutional commitment of the issue to a coordinate political department" or "a lack of judicially discoverable and manageable standards for resolving it." *Id.* at 252–53 (quoting *Baker*, 369 U.S. at 217). In doing so, *American K-9* noted

28

that these factors are related. *Id.* at 253 (citing *Nixon v. United States*, 506 U.S. 224, 228–29 (1993) ("[T]he concept of a textual commitment to a coordinate political department is not completely separate from the concept of a lack of judicially discoverable and manageable standards for resolving it; the lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch.")).

The bulk of federal authorities indicate that "republican form of government" presents a political question. The United States Constitution contains a guarantee clause similar to that of the Texas Constitution. The United States Constitution directs the United States to "guarantee to every State in this Union a Republican Form of Government." U.S. CONST. art. IV, § 4. "Although the Supreme Court has suggested that perhaps not all claims under the guaranty clause present nonjusticiable political questions, in the main the Court has found that such claims are not judicially enforceable." *Texas v. United States*, 106 F.3d 661, 666 (5th Cir. 1997) (citing *New York v. United States*, 505 U.S. 144, 182–86 (1992)). "In most of the cases in which the Court has been asked to apply the [Guarantee] Clause, the Court has found the claims presented to be nonjusticiable under the 'political question' doctrine." *New York v. United States*, 505 U.S. 144, 184 (1992). In *Pacific States*, the Supreme Court considered a taxpayer's challenge to an Oregon tax law on the ground that it was adopted by ballot initiative in violation of the Guarantee Clause. *Pac. States Tel. & Tel. Co. v. Oregon*, 223 U.S. 118 (1912). The Court concluded that challenges based on the Guarantee Clause present nonjusticiable political questions. In doing so, the Court declined to define the phrase "Republican Form of Government," instead concluding that that definition was of a political character and, hence,

29

beyond the jurisdiction of the courts. *Id.* at 133 ("[T]hat question has long since been determined by this court conformably to the practice of the government from the beginning to be political in character, and therefore not cognizable by the judicial power, but solely committed by the Constitution to the judgment of Congress."); *see also* Ryan C. Williams, *The "Guarantee" Clause*, 132 HARV. L. REV. 602, 671 n.431 (2018) ("The modern understanding of the political question doctrine as a barrier to all Guarantee Clause claims began to crystallize with the Court's 1912 decision in *Pacific States* . . . .").

As for Texas authorities, neither *Brown* nor *Bonner* expressly declined to address the republican-form-of-government challenges before them as political questions. *See Brown*, 75 S.W. at 496; *Bonner*, 138 S.W. at 574.[13] Both *Brown* and *Bonner* pre-date *Baker*, *American K-9*, and *Van dorn Preston*. That said, both *Brown* and *Bonner* spoke in terms that fit within the first two *Baker* factors, factors that were announced decades later.

On the first *Baker* factor, textual commitment to another branch of the government, *Brown* held that "it is within the power of the Legislature to determine what form of government will be most beneficial to the public and to the people of a particular community." *Brown*, 75 S.W. at 495–96. *Brown* made particular note that Galveston's city charter was the result of legislative action and that two state representatives and one state senator spoke for Galveston in

---

[13]The parties bring to our attention *Walling v North Central Texas Municipal Water Authority*, 359 S.W.2d 546 (Tex. App.—Eastland 1962, writ ref'd n.r.e.) (per curiam). The wording of the holding of *Walling* could be construed as either a refusal to decide the issue on justiciability grounds or a determination on the merits: "We find nothing in the United States Constitution or in the State Constitution which would *authorize us to say* that the citizens of the Authority are being deprived of a republican form of government." *Id.* at 549 (emphasis added). *Walling* dealt with a water district, not a city, and did not have the benefit of Texas Supreme Court authority examining *Baker*. *Id.* at 547. Further, *Walling* discusses neither *Ex parte Lewis*, nor *Brown*, nor *Bonner*. *See id.* *Walling*, then, is of little help in the present analysis.

the legislature. *Id.* at 496. On the second *Baker* factor, *Brown* observed that "the doctrine" of *Ex parte Lewis* "furnishes no standard or rule by which to determine the validity of any law framed by the Legislature . . . ." *Id.*

On the first *Baker* factor, *Bonner* held that "the Legislature may confer upon any municipal government any power it may see fit to give." *Bonner*, 138 S.W. at 574. *Bonner* further held that questions such as "recall, the initiative, and the referendum" are "for the Legislature in the creation of municipal governments." *Id.* at 574. Going further, *Bonner* stated, "It is not for the courts to decide that question." *Id.* On the second *Baker* factor, *Bonner* quoted Thomas Jefferson for the proposition that the definition of a "republican form of government" "is of very vague application in every language[,]" but that to an extent a definition can be formed, "governments are more or less republican as they have more or less of the element of popular election and control in their composition." *Id.* at 574. The conundrum is that *Bonner* then proceeded to use that as a standard in a federal challenge: "[w]e . . . will proceed to examine the provisions of the charter with a view of determining if it fulfills the definition given by Mr. Jefferson; and, if it does, it is not obnoxious to the provisions of the federal Constitution as above quoted." Hence, *Bonner* was decided on the Guarantee Clause, on which Appellants do not rely and, additionally, was decided shortly before *Pacific States*, in which the United States Supreme Court found Guarantee-Clause challenges to be political questions. *Pac. States*, 223 U.S. at 133.

We leave this here for now, with the discussion to be resumed in the Analysis.

31

## VI. The Judiciary's Role

Though there are circumstances under which courts can and should decline to resolve political questions, it emphatically remains the sole province of the judiciary to interpret the constitution. *Am. K-9*, 556 S.W.3d at 252 ("[t]o the courts alone"). Thus, if the constitution imposes a judiciable standard by which to measure the act(s) of the Legislature, it is the province of the courts to determine whether that standard has been met:

> The final authority to determine adherence to the Constitution resides with the Judiciary. Thus, the Legislature has the sole right to decide *how* to meet the standards set by the people in [the provision of the Texas Constitution there at issue], and the Judiciary has the final authority to determine *whether* they have been met.

*W. Orange-Cove Consol. I.S.D. v. Alanis*, 107 S.W.3d 558, 563–64 (Tex. 2003) (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176–178 (1803)).

The Texas Supreme Court's approach in the school finance cases is illustrative. There, the Texas Supreme Court undertook a comprehensive historical review of the Texas Legislature's acts on the subject before remanding for consideration of whether the Legislature had met the constitutional standards applicable to school financing. *See id.* at 564–73 (providing lengthy overview of legislation).

## VII. Analysis

We are faced with a novel argument. There has been no prior challenge to extraterritorial jurisdiction under Article I, Section 2, of the Texas Constitution. TEX. CONST. art. I, § 2.

The Appellants contend that, under *Ex parte Lewis*, they have the right to vote for municipal officers and that this right is not dependent on the Legislature. Appellants, therefore,

32

do not question the effectiveness of the Legislature in its role as representative of the interests of ETJ residents. Appellants did not, for example, bring forward all of the acts of the Legislature in this field in the fashion of the school funding challenges. Instead, Appellants question whether the Legislature may serve in that role at all. Appellants are of the view that Article I, Section 2, as construed by *Ex parte Lewis*, mandates that, if there is to be ETJ, the ETJ property owners must have a direct vote in city elections. *See id.*

But *Ex parte Lewis*, as discussed above, was rejected by the Texas Supreme Court, and the Court of Criminal Appeals backed away from the notion that cities are sovereigns unto themselves.

Aside from *Ex parte Lewis*, Appellants contend that *Brown* itself is a cities-as-sovereigns case, because of the statement in *Brown* that city charters are "formulated by the people of the towns." That takes words in isolation, stripping them from the context of *Brown*:

> [I]t is a matter of common knowledge that charters are formulated by the people of the towns, *presented by their representatives to the Legislature*, and, in case of opposition, committees attend upon the Legislature to secure the wish of the majority. *The city of Galveston had two representatives in the House and one in the Senate that enacted this law, and the bill was introduced in the House by one of her representatives, and supported by all*. To overthrow the charter of that city, upon the assumption of 'a history and tradition' which have no real existence, would in fact deny to the people of Galveston the right to govern their affairs in their own way, and thereby to substitute a form of municipal government dictated by the courts. In fact, this theory is out of harmony with the practices of republican state governments in America, and opens up a broad filed [sic.] in which to search for grounds to declare laws of a Legislature void, without the shadow of authority in the well-established powers of the courts under our Constitution.

33

*Brown*, 75 S.W. at 496 (emphasis added).

More broadly, *Brown* held that "it is within the power of the Legislature to determine what form of government will be most beneficial to the public and to the people of a particular community." *Id.* at 495–96. Since *Brown*, the Texas Legislature has seen fit to give cities extraterritorial jurisdiction, and in so doing, has declared that it, the Legislature, is looking out for the "general health, safety, and welfare" of those living "adjacent to" cities. TEX. LOC. GOV'T CODE ANN. § 42.001.

In sum, the Appellants present a facial constitutional challenge on grounds that have been rejected by *Brown*. We do not answer the questions of whether *Brown* and *Bonner* were political question cases as and when decided, or whether they would be considered political question cases today. We, as an inferior court, are confronted with what to do with the Appellants' facial challenge as presented to us today. We are subject to the Texas Supreme Court's adoption of the first two *Baker* factors in the decades after *Brown* and *Bonner*.

Concerning the facial challenge presented by the Appellants, *Brown* constitutes a textual commitment to the Legislature under the first *Baker* factor.

Regarding the second *Baker* factor, given *Brown*'s commitment of the matter to the Legislature, any challenge to extraterritorial jurisdiction under Article I, Section 2, of the Texas Constitution would need to put into words a standard of "republican form of government" by which to judge the *Legislature's* representation of citizens in the extraterritorial jurisdiction. The closest the Appellant came to such an articulation was in their reply brief, where they said that the Article I, Section 2, republican-form-of-government limitation on Legislative power is a

34

"modest one" that requires that "[p]roperty owners must merely be allowed to vote at some point for those that regulate their property." Taken on its face, "at some point" is a vague standard. Taken in context of how the Appellants relied on *Ex parte Lewis* for a right independent of the Legislature, (and on how the *Ex parte Lewis* approach was rejected), "at some point" does not address the question of Legislative representation of residents of the extraterritorial jurisdiction.

Further, the Texas Supreme Court, via *American K-9*, adopted the *Baker* "discriminating analysis," part of which is an assessment of "the possible consequences of judicial action." *Am. K-9*, 556 S.W.3d at 257 (quoting *Baker*, 369 U.S. at 211–12). Though the Appellants would stop with a finding of unconstitutionality, the "discriminating analysis" counsels that this Court should consider what would happen on the next day. Which is to say that, though the Appellants seek a declaration of unconstitutionality because they do not get to vote in city elections, their petition in the trial court, and their briefing here, are notable for their lack of a request for voting. In particular, Appellants do not explain what manner of voting, in their view, would suffice (for but one example, should residents of the ETJ be incorporated into existing city commission districts, or should the ETJ be given its own city commission district, etc.). Nor do Appellants specify who should give them such voting. Appellants, it appears, would leave that task to the Legislature, as they make no argument that the City could expand voting into the extraterritorial jurisdiction without legislative authority, and they do not ask the judiciary to grant them the voting they desire. At least not directly. Indirectly, any judicial finding of unconstitutionality would point to what is required for constitutionality. In addition to considering the next day, the "discriminating analysis" counsels pondering all the days going back to the beginning of

35

extraterritorial jurisdiction, because if a legislative act is void as unconstitutional, it is void "from inception." *Ex parte E.H.*, 602 S.W.3d at 494. Looking back to the inception of ETJ, a century has a particular persuasive power of its own. "[G]eneral public acceptance of and acquiescence in administrative and legislative interpretations over a long period of time are particularly persuasive and are to be given serious consideration in construing constitutional provisions." *Dir. of Dep't of Agric. & Env't v. Printing Indus. Ass'n of Tex.*, 600 S.W.2d 264, 269 (Tex. 1980) (citing, among other things, *Brown*, 75 S.W. 488). The Appellants' failure to wrestle with such questions is some indication that their case is unmanageable for the judiciary under the second *Baker* factor. *See Am. K-9*, 556 S.W.3d at 252–53; *Baker*, 369 U.S. at 217.

## VIII.  Conclusion

Although the Texas Supreme Court has never explicitly adopted the entirety of the *Baker* test, it has listed factors that may help determine if a political question exists. "Chief among them are whether there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department' or 'a lack of judicially discoverable and manageable standards for resolving it.'" *Van Dorn Preston*, 642 S.W.3d at 458. An application of these two *Baker* factors to the issue in this case—whether the City's ordinances violate the republican-form-of-government requirement found in Article I, Section 2, of the Texas Constitution—results in the conclusion that the issue presented by the Appellants is a nonjusticiable political question. First, there is a "textually demonstrable constitutional commitment" of the republican-form-of-government issue to the legislature. *Id.* The Texas Supreme Court's opinion in *Brown* found that the "Constitution . . . delegated to the Legislature" the people's authority to determine a

36

city's "form" and "power[s]" "and every provision with regard to [its] organization." *Brown*, 75 S.W. at 495–96. Secondly, there is "a lack of judicially discoverable and manageable standards" as to the issue because, as stated in *Bonner*, what constitutes a republican form of government is, by necessity, indefinite. *See Am. K-9*, 556 S.W.3d at 252–53 (quoting *Baker*, 369 U.S. at 217). As a result, because the *Baker* factors indicate that a political question exists, this Court may not address the issue, as presented by the Appellants, without violating the separation of powers.

We find that Appellants' facial challenge, as presented, presents a political question. We affirm the district court's grant of the Appellees' plea to the jurisdiction and the concomitant dismissal of the Appellants' case.


Jeff Rambin
Justice


Date Submitted:     June 14, 2023
Date Decided:       August 31, 2023

37